# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 20-sw-214 |
| 3636 16TH STREET NW, SUITE AG-50, WASHINGTON,D.C., AND ELECTRONIC DEVICES THEREIN UNDER RULE 41 | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. sec. 371, 1001, 1028A, 1031, 1343, 1344, 1349, 1623, 1924, 1956 | Conspiracy to defraud U.S., false statements, aggravated identity theft, major fraud against U.S., wire fraud, bank fraud, wire and bank fraud conspiracy, perjury, unauthorized removal/retention of classified materials, money laundering |

The application is based on these facts:

See Attached Affidavit of Special Agent Christopher Swenson

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Dept. of State-OIG Special Agent Christopher Swenson
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 09/18/2020 _____

_____
*Judge's signature*

City and state: Washington, D.C.

Robin M. Meriweather, United States Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | |
| *or identify the person by name and address)* ) | Case No.  20-sw-214 |
| 3636 16TH STREET NW, SUITE AG-50, ) | |
| WASHINGTON, D.C., AND ELECTRONIC DEVICES ) | |
| THEREIN UNDER RULE 41 ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A hereto

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B hereto

**YOU ARE COMMANDED** to execute this warrant on or before _____ October 2, 2020 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   09/18/2020 _____          _____
*Judge's signature*

City and state:      Washington, D.C. _____          Robin M. Meriweather, United States Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-sw-214 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

1.      The property to be searched is Montage Inc.'s ("MONTAGE") corporate offices located at Suite AG-50 at 3636 16th Street NW, in Washington, D.C. ("PREMISES"), and electronic devices therein.   The PREMISES are further described as being housed in a large multi-story mixed use residential and commercial building with a U-shaped driveway and a covered entrance that opens into a lobby with a security desk.  A picture of the exterior of the PREMISES building is below:



2.      The PREMISES are located on the first floor, in Suite AG-50 of the above building.  The PREMISES are accessed by entering through the main doors, passing the security desk, and taking the corridor on the first floor to the left.  A picture of the exterior of MONTAGE's business entry-space at Suite AG-50 is located below:



3.     The PREMISES are accessed through a dark-framed door with a large glass panel.  The words "ECKANKAR Reading Room" are printed on the glass in blue.  Above the door there appears to be a camera or other security system apparatus.  To the right of the door is a sign that says "AG-50."

# ATTACHMENT B

*Property to be seized*

1.       The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 18 of the United States Code, Sections 371 (conspiracy to defraud the United States), 1001 (false and fictitious statements), 1028A (aggravated identity theft), 1031 (major fraud against the United States); 1343 (wire fraud), 1344 (bank fraud), 1349 (conspiracy to commit wire and bank fraud), 1623 (perjury and false declarations before a court), 1924 (unauthorized removal and retention of classified materials), and 1956 (money laundering) (the "Subject Offenses"), as described in the search warrant affidavit, including, but not limited to:

   a.  Records and information relating to forged submittals for the Guayaquil Consulate Project in Ecuador, and other State Department or other Government construction projects;

   b.  Records and information relating to the use of Dropbox or other commercial internet transmittal services to transmit sensitive and/or classified materials;

   c.  Records and information relating to forged or fraudulent construction documents, including forged "As-Built" drawings for the Guayaquil Consulate Project in Ecuador;

   d.  Records and information relating to forged or fraudulent business licenses;

   e.  Records and information relating to falsified employee qualifications for MONTAGE personnel working, or proposed for work on, State Department constructions projects;

f.  Records and information relating to identity theft of third parties in connection with the submission of employee qualifications for construction projects;

g.  Records or information relating to the ownership and corporate structure of MONTAGE;

h.  Records and information that constitute evidence of use, control, ownership, or occupancy of the PREMISES and things therein;

i.  Records and information that constitute evidence of the state of mind of MONTAGE, MOAYEDI, and/or MONTAGE's employees, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

j.  Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with MOAYEDI or other MONTAGE employees about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

2.  Digital devices used in the commission of, or to facilitate, the above described offenses, including devices used to create, or to electronically submit, forged construction plans to the State Department; devices used to transfer sensitive and potentially classified information electronically through unauthorized cloud computing systems or the internet, devices used to create or electronically submit forged final drawings to the State Department; and devices used

2

to commit identity theft by misappropriating the resume of a third party and/or electronically editing the resume.

3.    For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

    a.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

    b.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

    d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

    e.  evidence of the times the Device(s) was used;

    f.  passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

g.  documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

h.  records of or information about Internet Protocol addresses used by the Device(s);

i.  records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.  Routers, modems, and network equipment used to connect MONTAGE computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data

4

(excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**IN THE MATTER OF THE SEARCH OF:**

**3636 16TH STREET NW, SUITE AG-50**
**WASHINGTON, D.C., AND**
**ELECTRONIC DEVICES THEREIN**

**UNDER RULE 41**

SW No. ____20-SW-214____

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Christopher D. Swenson, Special Agent of the U.S. Department of State ("State Department"), Office of the Inspector General ("OIG"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 3636 16th Street NW, Suite AG-50, Washington, D.C., hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I have been employed as a Special Agent with the State Department for over seven years.  During that time, I have conducted complex, multinational investigations and have made arrests for complex financial crimes involving money laundering, identity theft, wire fraud, visa fraud, and bank fraud.  Based on my training and experience, I am familiar with the use of electronically stored information in such investigations.  During my career, I have participated in the execution of numerous search warrants involving documentary and electronic evidence.  I

have received numerous certifications in computer and mobile device forensics, attended training in white collar fraud, and completed approximately 27 weeks of New Agent Training at the Federal Law Enforcement Training Center in Brunswick, Georgia, and the Diplomatic Security Training Center in Dunn Loring, Virginia.

3.     Prior to my employment with the State Department, I was a sworn officer with Homeland Security Investigations, and served as a police detective and supervisor with the City of Newburgh, New York, police department, where I was assigned to investigate homicides, robberies, and gang conspiracy cases.  I have a total of approximately 20 years of law enforcement experience and have made over approximately 700 arrests.  As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18 of the United States Code, Sections 371 (conspiracy to defraud the United States), 1001 (false and fictitious statements), 1028A (aggravated identity theft), 1031 (major fraud against the United States), 1343 (wire fraud), 1344 (bank fraud), 1349 (conspiracy to commit wire and bank fraud), 1623 (perjury and false declarations before a court), 1924 (unauthorized removal and retention of classified materials) and 1956 (money laundering) (the "Subject Offenses"), have been

committed by MONTAGE, INC. (a construction company), Sina MOAYEDI (the owner of MONTAGE), and other co-conspirators.

6.  Among other things, MONTAGE, MOAYEDI, and/or its principals and agents have (a) lied that MONTAGE is a female-owned small business; (b) lied that its employees have the qualifications necessary to complete the construction projects, such as a fake engineering degree; (c) repeatedly forged an architect's signature and forged a Washington D.C. business license; (d) supplied the resume of an individual who did not work for MONTAGE in order to secure a contract; (e) allowed foreign nationals—who did not have a security clearance—unfettered access to classified building plans, including plans for an FBI facility; and (f) uploaded sensitive project plans and drawings to the internet, via the commercial application known as DropBox.  In so doing, MONTAGE, MOAYEDI, and MONTAGE's employees have defrauded the U.S. Government, harmed MONTAGE's competitors, jeopardized national security, and jeopardized physical security—as certain structures built by MONTAGE, including some that currently house U.S. military members and diplomats, may not be structurally secure. Thus, there is probable cause to search the PREMISES, which are MONTAGE's corporate headquarters, further described in Attachment A, for the things described in Attachment B.

## PROBABLE CAUSE

7.  Since in or around June 2018, I have been investigating government contract fraud and associated misconduct related to MONTAGE, INC.  MONTAGE is a U.S.–based business incorporated in 1986, which is primarily involved in worldwide Government construction projects, including embassies, military posts, consulates, and similar overseas properties owned and operated by the United States Government.  MONTAGE has performed

over $220 million dollars in contracting work for the U.S. Government, including for the Department of Defense, the Department of Justice, the State Department, the Federal Bureau of Investigation, the Department of the Interior, the Department of Agriculture, NASA, the EEOC, and the Department of Veterans Affairs.

8.      Since 2014, MONTAGE appears to have focused primarily on competing for and obtaining contracts with the State Department.  During that period, the State Department has awarded MONTAGE approximately six U.S. Embassy/Consulate construction project contracts totaling $100 million in locales such as Ecuador, Spain, Sudan, the Czech Republic, and Bermuda.[1]

9.      MOAYEDI purports to be the Vice President of MONTAGE, but based on the information provided further below, I submit that there is probable cause to believe that MOAYEDI is actually the true and beneficial owner of MONTAGE, that MOAYEDI is the controlling entity behind MONTAGE, and that MOAYEDI makes all material decisions on MONTAGE's behalf.

10.     MONTAGE operates out of two corporate headquarters in the Washington, D.C. area.  The first location is the PREMISES.  The PREMISES is the only location that MONTAGE lists as its corporate headquarters, and holds out to the public as its primary business location. However, as discussed herein, MONTAGE also operates a second "hidden" location at 4601 N. Park Ave Suite 101C, Chevy Chase, Maryland ("LOCATION-1"), which is unknown to the public, and where MONTAGE's employees work on a daily basis.  As discussed herein, I submit

---

[1] A review of bank records shows that MONTAGE routed several hundred wire transfer payments through the Southern District of New York to support its business operations abroad.

that there is probable cause to believe that evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES will be found at both the PREMISES and LOCATION-1.[2]

### Background on the GUAYAQUIL PROJECT

11.     Based on my training, experience, and involvement in this investigation, including my review of various documents and records and my participation in various interviews, I am aware of the following, among other things:

        a.      On or about September 30, 2014, the State Department awarded a contract to rehabilitate certain existing buildings and to construct a new Marine Security Guard residence ("MSGR")[3] at the United States Consulate in Guayaquil, Ecuador ("the GUAYAQUIL PROJECT").  The value of the GUAYAQUIL PROJECT was approximately $17 million and was awarded as a design-build contract to MONTAGE.

        b.      A "design-build contract" is a type of contract solicitation in which the award combines both the architecture and construction services into one contract.  With regard to State Department projects, a firm that is awarded a design-build contract is obligated to both design and construct the structure utilizing the current best practices of the profession, as well as by relying upon specific standards delineated by the State Department's Overseas Building

---

[2] Accordingly, the Government is also seeking a warrant for LOCATION-1, in an application it will be presenting to the United States District Court for the District of Maryland.

[3] U.S. Marine Corps detachments are responsible for providing worldwide security at American embassies, American consulates, and other official United States Government overseas offices such as NATO.

Operations division ("OBO").  These standards are referenced and incorporated by reference into the contract.

        c.     One such standard incorporated into State Department projects is the designation of a Designer-of-Record (the "DOR").   The DOR is the head of the architectural/engineering ("A/E") team and is solely vested with the authority to draft and submit architectural drawings or make structural or engineering changes on a given project.[4]

        d.     The A/E subcontractor that is performing work on the GUAYAQUIL PROJECT is "BCG," an architecture firm based in Buenos Aires, Argentina.  Two individuals working for BCG, "ARCHITECT-1" and "ARCHITECT-2," are the lead architects assigned to the GUAYAQUIL PROJECT as the DOR.

        e.     The State Department's OBO division requires contractors to submit all planning, design, and architectural documents, called "submittals," via a sensitive but unclassified computer system called "Projnet."[5]  Projnet is a system accessible only by registered users who have completed training in its use.  Users are required to have their own credentials to access the system, which include the users' e-mail address and password as unique attributes.

---

[4] It is common for the firm awarded the winning bid to employ various specialty subcontractors, including architects and engineering firms, to perform some or all of the functions required under the design-build contract.

[5] Generally, submittals are drawings, architectural planning proposals, and materials specifications relating to how certain aspects of a facility should be designed and built.  Thus, for example, a submittal may contain the design for a structure's fire control system, or it may contain the proposed design for a certain portion of the building's electrical service.

f.      Projnet allows there to be a permanent record of submittals that were approved, rejected, revised, and/or reviewed by pertinent personnel from OBO or the contractor. Projnet also provides email notification to users that are authorized access on a project, notifying them of actions that have been taken, or confirming that documents have been uploaded.

**Forged Submittals to the Government and Aggravated Identity Theft**

12.     Based on my discussions with officials at the State Department, interviews of witnesses, conversations with other agents, and my review of documents and materials related to this case, I know that on or about October 30, 2016, the OBO Project Director for the GUAYAQUIL PROJECT ("OBO DIRECTOR-1") identified anomalies in certain A/E documents uploaded via Projnet by MONTAGE personnel that purported to be signed by the DOR (the "Forged Submittals").  Among the anomalies discovered were certain submittals that did not appear to have come from the DOR.  The State Department notified MOAYEDI regarding these anomalies in Fall 2016.  In response, MOAYEDI sent the State Department contracting officer a letter, dated November 7, 2016, in which MOAYEDI stated, among other things, that (1) the submittals in question were for "previously approved submittals," (2) any fraudulent submittals were the result of an unnamed employee acting "mindlessly" and due to previous experience with another employer, and (3) (as discussed further below) MOAYEDI and MONTAGE were unaware of any unauthorized use of commercially available services such as Dropbox.[6]

_____

[6] As discussed herein, my investigation later demonstrated that these statements were false.  For example, further review of the submittals referenced in the November 2016 MONTAGE letter sent by MOAYEDI show that numerous submittals were in fact, new submittals, and were not previously approved by anyone, as alleged by MOAYEDI in the letter.

13.    After I began investigating this matter in 2018, I contacted ARCHITECT-1 for clarification, after which I discovered that BCG and the A/E team had no record of such submittals being received, signed, or otherwise approved, contrary to MOAYEDI's representation.

14.    On or about July 25, 2018, I traveled to Argentina to personally interview ARCHITECT-1.  ARCHITECT-1 stated that he had never given authorization for any other individual to affix his signature, utilize his signature and/or architectural stamp, and had not authorized any others to use his means of identification for any purpose.

15.    Furthermore, ARCHITECTS-1 and -2 provided me with a complete set of GUAYAQUIL PROJECT documents that they authenticated (the "Project Document Set"). ARCHITECTS-1 and -2 further informed me that any document other than what was contained in the Project Document Set they had provided would not be a legitimate project document, because it had not been signed by the DOR nor submitted to the State Department.  I also learned from ARCHITECTS-1 and -2 that their firm was never contracted to, nor were they intending to, deliver final drawings on the project, known as "as-builts."[7]

16.    After meeting with the DOR in Argentina, I and other State Department officials reviewed the Project Document Set that they had provided.  By comparing the universe of the

---

[7] Referred to as "as-builts," the final drawings of a project are generally produced after the fact, and are required to contain accurate renditions of all the design and construction that was performed on a particular project.  As-built drawings are vital to the on-going operation and maintenance of a facility, because they show the Government, among other things, where essential heating, ventilating and air conditioning systems are located, or where electrical utility components or fiber optic systems are located, for example.

Project Document Set with the full set of submittals that the State Department had previously received via Projnet, I and other State Department officials determined that the State Department was provided with numerous additional submittals involving life safety and structural issues that purported to be signed by the DOR, but were actually forged documents—documents that were not included in the Project Document Set provided by the DOR.

17.     In short, I and other agents investigating this case have identified an approximate six-month period in 2016 during which multiple engineering and construction design submittals relating to the GUAYAQUIL PROJECT were alleged to have been approved by the DOR and submitted to the State Department.  But in actuality, the submittals were forgeries, because BCG informed us that they had neither reviewed nor approved any of them, and—being unaware of the submittals—BCG had never verified that any of the specified fieldwork in the submittals had been performed at the Consulate. Many of these submittals included material changes to the original design of the structure.  The following non-exhaustive list contains several examples:

    a. A submittal concerning fire extinguishers and fire protection was determined to have been uploaded to Projnet by MOAYEDI on or about September 23, 2016, and contained a forged DOR signature.

    b. A submittal concerning structural steel drawings was determined to have been uploaded to Projnet by MOAYEDI on or about September 29, 2016, and contained a forged DOR signature.

    c. A forged submittal concerning concrete materials was signed by GUAYAQUIL PROJECT manager, Thad Quarles, and uploaded to Projnet by an employee of MONTAGE on April 27, 2015.  Among other things, in this instance, a genuine prior submittal was modified and resubmitted as a forgery purporting to be for "concrete mix design."

    d. A submittal concerning fire resistant glazing was uploaded to Projnet by MOAYEDI on or about August 15, 2016, and contained a forged DOR signature.

     e.  A submittal concerning roof design was uploaded by MOAYEDI on or about November 23, 2016, and was signed by an individual other than the designated DOR.[8]

18.    None of these submittals were authorized, because none were approved by the DOR. Moreover, MONTAGE continued to receive payments for the work it performed, because the State Department was unaware that MONTAGE was generating forged submittals.

### The Use of Dropbox and the Internet for Classified or Sensitive Department Records

19.    Based on my discussions with officials at the State Department, interviews with witnesses, conversations with other agents, and my review of documents and materials related to this case, I also know that MONTAGE officials frequently instructed the DOR to use a commercially available electronic storage and file transfer service called "Dropbox" or "Dropbox.com" to transfer submittals, which is strictly prohibited.

20.    Information regarding the construction and operation of overseas United States government properties is either classified, or sensitive but unclassified ("SBU") information. Even information that is only designated "SBU" is subject to strict controls over its dissemination because it may reveal, among other things, critical infrastructure, building vulnerabilities, points of ingress and egress, or sensitive law-enforcement data. For this reason, State Department contractors working in overseas environments are contractually required to

---

[8] Other anomalies on other submittals not specifically outlined here include additional signatures of individuals signing as the DOR who were not authorized to do so, submittals missing signatures of the DOR, and additional submittals using a fraudulently employed "digitized" signature of the DOR.

share project documentation on the Projnet system only, as opposed to sharing such information on publicly available share systems such as Dropbox.com.[9]

21.     Despite these contractual requirements, while meeting with ARCHITECT-1 in Buenos Aries, ARCHITECT-1 provided me with an email from MONTAGE project manager Thad QUARLES, dated January 20, 2015, in which QUARLES instructed ARCHITECT-1 to use Dropbox.  The email, which was sent from the email address tquarles@MONTAGEinc.com, stated in substance and in part, "I will be sending you a drop box link that contains folders for the submittals per division. Each time we make a submission in this folder we will send you an email locating the file that you need to open for review. We will keep an updated submittal log as well."   Also included on the above correspondence was MOAYEDI (utilizing email sinam@MONTAGEinc.com) and MONTAGE employee Marianela Lugo (utilizing email pm11@MONTAGEinc.com).  MOAYEDI was cc'ed on this email, which predated by more than a year the letter that MOAYEDI wrote the State Department in November 2016, in which he claimed that he and MONTAGE were "unaware of any unauthorized use of Dropbox…"

22.     Moreover, in the course of my investigation, other individuals with knowledge confirmed that MOAYEDI and MONTAGE had ordered the use of Dropbox for communications relating to the GUAYAQUIL PROJECT, in direct contravention of the Project contract, and thereby placing at risk SBU materials relating to the design and construction of the Project.  For example:

---

[9] Sharing SBU information on commercially available services such as Dropbox exposes that information to the risks of theft, hacking, and exploitation by foreign intelligence agencies, among other things.

a.     On or about November 13, 2018, I interviewed a former MONTAGE employee ("FORMER EMPLOYEE-1").   FORMER EMPLOYEE-1 was employed by MONTAGE during approximately 2014 and 2015.   FORMER EMPLOYEE-1 stated that MONTAGE utilized the commercial cloud-based storage service Dropbox for the storage of sensitive and possibly classified material.   Moreover, FORMER EMPLOYEE-1 stated that she directly expressed concern to MOAYEDI about Dropbox and its use, and MOAYEDI told her not to tell anyone that MONTAGE used the service.

b.     Similarly, in or about April 2019, I interviewed another former employee of MONTAGE ("FORMER EMPLOYEE-2").   FORMER EMPLOYEE-2 was employed by MONTAGE from approximately 2016 to 2019. FORMER EMPLOYEE-2 confirmed that MONTAGE employees frequently emailed classified information amongst each other on the internet and via unclassified means.   MONTAGE also had a practice of transferring classified material via the unsecure Dropbox.com service on the internet.   FORMER EMPLOYEE-2 believes that MONTAGE stored all of the data from *every* project within its account on Dropbox.com.

### MONTAGE Forged the As-Built Drawings for the GUAYAQUIL PROJECT

23.     On or about August 12, 2018, I traveled to Guayaquil, Ecuador, and interviewed OBO DIRECTOR-1.   As mentioned, OBO DIRECTOR-1 served as the representative of OBO on site at the GUAYAQUIL PROJECT.   He also served as the Contracting Officer's Representative ("COR") during his tenure.

24.     Among other things, OBO DIRECTOR-1 stated that when evaluating whether to approve a submittal in his capacity as Project Director and COR, he relies on the information

submitted to be true and accurate.  He further stated that when certifying contractor payment requests, he relies on the fact that such requests accurately represent work completed as per the terms of the contract.  OBO DIRECTOR-1 further discussed with me the importance to a project of accurate drawings.  For example, he referenced the Kansas City Hyatt disaster as one of the results that can occur from inadequate reviews, improper design changes, or a lack of communication between the engineer and the build team.[10]  As such, OBO DIRECTOR-1's expectation was that properly certified as-built drawings would be maintained during the life of the GUAYAQUIL PROJECT, and that final as-built drawings would be submitted at the conclusion of the project.

25.     From my review of Projnet and my conversations with witnesses, I know that on or about August 29, 2018, a set of "final" as-built drawings were uploaded via the internet to Projnet by a MONTAGE employee ("FORMER EMPLOYEE-5") who was the then-project manager for MONTAGE at the Guayaquil Project (the "As-Built Drawings").  These architectural drawings, like other drawings, and the aforementioned submittals in design/build contracts, are required to be certified by the DOR.

26.     I examined the As-Built Drawings and observed the signature, and architectural stamp and logo of the DOR and their company, BCG.  But in an email communication with BCG on or about September 21, 2018, I confirmed that the As-Built Drawings were never reviewed or signed by BCG.  BCG further represented to me that they were never asked to provide as-built

_____

[10] The referenced incident is the 1981 Hyatt Walkway Collapse, in which 114 people were killed and over 200 injured due to a complete structural failure of two walkways situated directly on top of one another in Kansas City, Missouri.

drawings for the GUAYAQUIL PROJECT, and moreover, BCG would never have provided as-built drawings without verifying their accuracy through a field inspection—which they did not do. BCG further informed me that if I was in possession of documents purporting to be As-Built Drawings for GUAYAQUIL, I could be assured that they were never reviewed or approved by the DOR.

27.     I further reviewed MONTAGE's payment forms, called "Application and Certifications for Payment." These requests for payment are submitted electronically via email, and are necessary in initiating payments from the State Department to a contractor. These forms further include the certification that: "The undersigned contractor certifies that to the best of the Contractor's knowledge information and belief the work covered by this application for payment has been completed in accordance with the contract documents…"

28.     Moreover, the GUAYAQUIL PROJECT payment certifications contain additional verbiage attesting that as-built drawings were being maintained as the project was being constructed, and were maintained as current. A further review of these payment certifications for the GUAYAQUIL PROJECT showed that MOAYEDI had certified invoices in 2015, 2016, 2017 and 2018, stating that MONTAGE was in full compliance with the terms of the contract, causing nearly $17,000,000 to be paid to MONTAGE by the United States Government. Moreover, MONTAGE personnel have continued to submit official documents certifying that they have complied with the terms of the contract, including as recently as July 2020.

29.     I was further informed by BCG that on or September 20, 2018, BCG received an email from FORMER EMPLOYEE-5 (who was then a MONTAGE project manager) asking for "final acceptance" of a set of nine computer assisted design drawings relating to "seismic

bracing," to be included in the final seismic package requested by OBO.[11]  Upon review, BCG reported to me that these drawings had been the subject of unauthorized modification by MONTAGE, by adding the words "AS-BUILT" and keeping ARCHITECT-1's stamp and signature on them.  These documents appeared to have been fabricated by MONTAGE and purported to reflect the GUAYAQUIL PROJECT's as-built conditions.  But ARCHITECT-1 reported that because BCG had not conducted an inspection of this aspect of the project's construction, BCG could not warrant that the drawings were accurate, or that the specified components in the building were in fact installed correctly, or that they would withstand a seismic event, thereby jeopardizing the safety at GUAYAQUIL.

30.    In short, based on the information provided by BCG, and on my conversations with OBO DIRECTOR-1 and other witnesses, it is clear that MONTAGE forged the DOR's signature on the As-Built Drawings, and falsely certified that it had properly maintained and prepared the As-Built Drawings, when it had not.  As a consequence, the United States Government is now the owner of a $17 million construction project in Ecuador for which it has no reliable architectural drawings that it can reference when performing future maintenance, repairs, or renovations.  In addition, the facility may be potentially compromised in the event of an earthquake or other seismic event.

---

[11] Generally, seismic bracing systems are designed and engineered to secure suspended non-structural equipment such as HVAC ducts, or electrical or plumbing components, within a building to minimize damage from an earthquake or seismic event.

**MONTAGE Falsified The Qualifications of Contractually Required Personnel**

31.     State Department construction contracts also typically contain mandatory requirements concerning the requisite skills, training, and job experiences regarding the principal individuals employed by the firm awarded the contract.  Based on my discussions with officials at the State Department, interviews with witnesses, conversations with other agents, and my review of documents and materials relating to this case, I also know that MONTAGE also violated its contracts by intentionally deceiving the State Department regarding the qualifications of many of its key individuals employed on State Department projects.

32.     For example, on or about October 2, 2018, I interviewed a former employee of MONTAGE that served as an office assistant to MOAYEDI ("FORMER EMPLOYEE-3"). FORMER EMPLOYEE-3 was employed by MONTAGE during approximately 2014 to 2016. During FORMER EMPLOYEE-3's employment, MOAYEDI had directed FORMER EMPLOYEE-3 to engage in such activities as counterfeiting a Washington, D.C. business license, and misrepresenting the dollar value of projects completed in bid submissions to the United States Government.  FORMER EMPLOYEE-3 also stated that MONTAGE kept a "bank" of resumes it used to fill contractual requirements that belonged to individuals who had never worked at MONTAGE during the claimed period, if at all.  FORMER EMPLOYEE-3 further informed me that, while at MONTAGE, she was instructed to modify certain submittals by changing their submission numbers.

33.     Likewise, on or about October 3, 2018, I interviewed another former employee of MONTAGE ("FORMER EMPLOYEE-4").   FORMER EMPLOYEE-4 was employed by MONTAGE during a period of approximately 2014 to 2015.  FORMER EMPLOYEE-4 stated

that MOAYEDI conspired with him to falsely claim that he met United States Government contractual requirements by fraudulently claiming that he had worked for MONTAGE for a longer period of time than was true and by delineating responsibilities that FORMER EMPLOYEE-4 never had.  MOAYEDI informed FORMER EMPLOYEE-4 that this was to meet State Department and contractual requirements governing minimum experience in certain key positions.

34.     Based on information derived from the above witness interviews, I then reviewed resumes submitted by MONTAGE for various State Department projects.   Department requirements referenced in the contract specify certain levels of experience in order to serve as "key personnel" (*i.e.*, personnel whom the State Department has deemed critical to the safe, successful, and timely completion of a project).   For example, a typical State Department contract requires that the Project Manager have a minimum five years of professional employment as an engineer or architect managing comparable work, as well as a bachelor's degree in architecture or engineering.

35.     In the course of my review, I identified numerous deficiencies regarding the resumes of key personnel submitted to the State Department for the GUAYAQUIL PROJECT. To state just three of the many examples that I found:

a.      MONTAGE submitted an individual for the key role of Project Controls Engineer and Site Health Project Manager.  In the claimed experience for this individual, it stated that he was employed at MONTAGE since 2008 and had "inspected emergency egress and life/safety issues" and conducted "inspections of asbestos containment."  In fact, this individual

had only been employed at MONTAGE for approximately one year, and served in an office staff capacity, performing none of those duties.

b.  Similarly, the aforementioned Thad QUARLES was submitted for the key role of Project Manager.  As per the contractual requirements, QUARLES' experience and work history were laid out in a resume (the "QUARLES Resume").  The QUARLES Resume stated that he had earned a bachelor's Degree in Civil Engineering from Southern Polytechnic University.  However, I reviewed sworn testimony from a 2019 civil deposition in which QUARLES stated that he attended Southern Polytechnic for only two years and does not possess an engineering degree.  The QUARLES Resume also claimed years of full-time complex work in the construction field in various capacities over several years.  I cross-referenced this claimed work experience with QUARLES' SF-86 security clearance paperwork and found that QUARLES had actually sold meat as a door-to-door salesman, was a landscaper, and built swimming pools for several years during the same time period.

c.  I also reviewed MOAYEDI's resume, which had been submitted to the State Department as part of the quality control plan for a $15 Million project awarded to MONTAGE in 2016 for compound security upgrades at the United States Embassy in Madrid, Spain (the "MOAYEDI Resume").  The MOAYEDI Resume claimed that MOAYEDI had earned a master's degree in Architecture from The Catholic University of America in 1982.  But I cross-referenced this claimed experience with MOAYEDI's SF-86 security clearance paperwork, and found that MOAYEDI had not actually earned this degree until 2014.

36.  From my investigation, there is probable cause to believe that the above examples are only illustrative of numerous misrepresentations MONTAGE has made to the U.S.

Government as part of efforts to secure contracts from the Government.   I discovered multiple examples, across multiple projects for which MONTAGE was the winning bidder, in which MONTAGE presented false qualifications for key individuals to the United States Government. For example, in addition to the GUAYAQUIL PROJECT, I discovered, among other things, that MONTAGE had deprived the United States Government of the services of qualified individuals in a $20 million project awarded to MONTAGE in 2016 for compound security upgrades at the U.S. Embassy in Prague, Czech Republic, and a $16 Million project awarded to MONTAGE in 2017 for the Marine Security Guard Residence at the U.S. Embassy in Khartoum, Sudan.

### The Identity Theft of VICTIM-1

37.     In the course of my investigation I also observed that the name of a particular individual ("VICTIM-1"), and her accompanying biographical and resume information, had been submitted by MONTAGE to the State Department as a qualified key personnel on numerous occasions.   I reviewed the SF-86 security clearance paperwork for VICTIM-1 and noted no record of VICTIM-1 having worked for MONTAGE. Additionally, a review of MONTAGE's "QuickBooks" payroll records showed no instance of VICTIM-1 having been paid by MONTAGE.

38.     On or about December 13, 2018, I interviewed the true VICTIM-1 that was the subject of these submissions.   VICTIM-1 confirmed to me that she was unfamiliar with MONTAGE, had never worked for MONTAGE, and had never authorized any individuals to submit her resume in support of any project.[12]   Additionally, VICTIM-1 authenticated certain

---

[12] VICTIM-1 is unsure how MONTAGE obtained her resume.   However, she notes that she worked for a rival construction company, where one of her co-workers abruptly resigned and

portions of her resume that had been submitted by MONTAGE to the State Department, but noted that there were numerous insertions and fraudulent misrepresentations as to her depth and breadth of experience, including the assertion that she had worked for MONTAGE for several years.

39.     I also located an example of VICTIM-1's identifying information and resume when it had been submitted by MONTAGE in 2014 in support of the contract bid package for the GUAYAQUIL PROJECT.   Among the numerous false assertions that MONTAGE made concerning VICTIM-1 with regard to the Guayaquil Project were that:

a.      VICTIM-1 had been employed by MONTAGE as a Quality Control Manager since 2009, working on several MONTAGE projects, including classified and Department of Defense projects;

b.      VICTIM-1 would be the Quality Control Manager should MONTAGE win the GUAYAQUIL PROJECT bid, and would report directly to Sina MOAYEDI; and

c.      VICTIM-1 was "currently committed" to a MONTAGE project in Idaho involving the construction of an FBI building.

40.     I also reviewed the "audit trail" information in Projnet for the submission of VICTIM-1's resume and observed that Sina MOAYEDI had uploaded the document containing this information, along with submittal form stating "I certify the above items have been reviewed in detail and are in strict conformance with the contract drawings and specifications except as otherwise stated."  This form was also digitally signed by MOAYEDI.

---

went to work for MONTAGE—where he was assigned to the GUAYAQUIL PROJECT.  She believes that this co-worker may have stolen her resume and provided it to MONTAGE.

41.     I further located additional instances where VICTIM-1's resume was uploaded to Projnet as proposed "key personnel" for a project.  For example, in 2016, VICTIM-1's Resume was submitted for the key role of Quality Control Manager for the compound security upgrade project at the U.S. Embassy in Prague.  Once again the qualification statements associated with Victim-1 for this submission were false.  By reviewing the "audit trail" information in Projnet, I again observed that Sina MOAYEDI had uploaded the document containing this information, along with a signed certification that the information was accurate.

### MOAYEDI's Ownership Fraud Regarding MONTAGE

42.     As has been discussed, MOAYEDI purports to be the Vice President of MONTAGE.  Based on my review of Maryland Secretary of State records for MONTAGE, I learned that MOAYEDI was listed as the President of the corporation from inception through on or about October 15, 2014.  The record then stated that on that date, MOAYEDI sold 51% of MONTAGE to Maria QUEVEDO.  This submission was signed by both MOAYEDI and QUEVEDO.

43.     However, my investigation revealed that, even *before* MOAYEDI allegedly sold 51% of the company to QUEVEDO, MOAYEDI claimed that MONTAGE was a female-owned business.  For example, a review of the GUAYAQUIL PROJECT bid package submitted to the State Department, dated on or about August 25, 2014, claimed several times that MONTAGE was a "woman-owned business," including listing this as the first qualification for the bid.  MOAYEDI digitally signed this submission, certifying that it was true—but it was not, because it pre-dated the October 2014 ownership sale reported to the Maryland Secretary of State.  Additionally, MONTAGE again claimed in a bid package submitted in support of a Copenhagen,

Denmark project dated September 9, 2014, that MONTAGE was a "woman-owned business." This again was false, because it predated the October 2014 ownership transfer.

44.     Elsewhere, MOAYEDI's statements cast doubt on the claim that MONTAGE is a woman-owned business.  For example, MONTAGE applied to renew a line of credit with United Bank in 2016.  While conducting routine due diligence, a commerical lender at United Bank emailed MOAYEDI at sinam@MONTAGEinc.com, stating: "Hi Sina, I was preparing/collecting documentation for the renewal of MONTAGE line of credit and came across the attached filing from Maryland State website…that Maria Lugo owns 51% of MONTAGE.  However, the company's 2014 Tax return form 1125E indicates you are 100% owner. Can you please clarify and provide us with the ownership structure of the company?"

45.      In his response, dated August 1, 2016, MOAYEDI stated in relevant part:  "I am the sole owner and President of MONTAGE and have always been. The document you have sent is an error and we are going to correct it this week. Maria is a family friend and like my daughter and I had considered at one point to have her follow in my footsteps but we never proceeded with this. We will go to Baltimore and make the correction this week."

46.     According to Maryland Secretary of State records, two days later, on August 3, 2016, MONTAGE filed a corporate amendment stating: "Maria Quevedo Lugo sold the 51 % of the shares of MONTAGE, Inc. to Sina MOAYEDI."  This document was not signed by Quevedo, and was signed only by MOAYEDI.

47.     But despite his representations to United Bank, and to the Maryland Secretary of State, MOAYEDI has a long history of continuing to claim that QUEVEDO was the president

and majority owner of MONTAGE, even after 2016.[13]  For example, I reviewed the historical System for Award Management ("SAM") website run by the U.S. Government General Services Administration (GSA). Registration in the SAM database is required for companies wishing to compete for Government Contracts, and SAM collects a variety of information provided by companies in order to properly classify the socio-economic status of a company.  My review found that MONTAGE registered as a minority owned, woman owned, Hispanic-American business in 2013, 2014, 2015, 2016, 2017, 2018, and 2019.  In 2013, Maria Lugo QUEVEDO was listed as the owner, but no title for her was listed.  From 2014-2019, Maria Lugo QUEVEDO was listed as the owner and President of the company.  In 2020, MONTAGE no longer listed QUEVEDO as the owner of the company, and MOAYEDI was again listed as the owner and President of the company.

48.     And my review of MOAYEDI and QUEVEDO's SF-86 security clearance paperwork told yet another story.  For example:

a.     QUEVEDO claimed she only worked part-time at MONTAGE from 2008 through 2014 on nights and weekends, but is "still on the books full-time because it is her family business, but she only physically works part-time" as the HR administrator.

b.     QUEVEDO then claimed to have been "on-leave" from MONTAGE from December 2012 through 2013 because "there was no business."  QUEVEDO, in fact, claimed Washington, D.C. unemployment benefits in 2013 based on this break.

---

[13] There are certain advantages to being "certified" as a woman-owned business.  For example, women-owned businesses must be awarded 5% of a contract's total dollar value for many Government contracts.

c.      Moreover, on or about April 14, 2014, QUEVEDO stated in her SF-86 interview that she actually had had a full-time position at a competing construction company, CONSTRUCTION COMPANY-1 since January 2014.   She further admitted that CONSTRUCTION COMPANY-1 "was unaware she has a clearance and works for MONTAGE, and she doesn't want them to know and there is no need to inform them because she doesn't need a clearance to work at [CONSTRUCTION COMPANY-1]."

d.      And, in *his* security clearance paperwork in 2016, MOAYEDI claimed to be the Vice President of MONTAGE.   For example, during a September 28, 2016, interview, MOAYEDI stated that he was the President from 2009-2011 but then Maria QUEVEDO purchased the majority of the company in 2012 and is "now the President of the company."   This statement directly conflicted with the statement MOAYEDI had signed and filed with the Maryland Secretary of State, in which he told the state that QUEVEDO had sold 51% of MONTAGE back to him.

49.      MOAYEDI and QUEVEDO have made a variety of further conflicting statements regarding who controls MONTAGE, including signed statements and statements under oath.   To take one example, in a sworn civil deposition taken on or about November 13, 2019, MOAYEDI contradicted himself again, claiming that QUEVEDO had been the president of MONTAGE "ever since" 2002.

50.      As described herein, I believe that MOAYEDI was and always has been the owner and principal of MONTAGE, and that QUEVEDO serves as his alter ego/nominee for the purposes of conferring minority and woman-owned business status on MONTAGE, which would afford MONTAGE benefits when seeking contracts with the State Department.   I base this

conclusion, in part, on the fact that, as described herein, MOAYEDI controls the day to day operations of the company, and has directed others to commit many of the Subject Offenses that are outlined herein.  Moreover, QUEVEDO has been described as "a family friend," appears to have no role in the day-to-day operation of the company, and in fact, at various times, has claimed to be unemployed, or has worked for another construction company.

### The PREMISES Search

51.     As stated, the PREMISES are one of two MONTAGE corporate office locations in the greater Washington, D.C. area.  Located at Suite AG-50 at 3636 16th Street NW, in Washington, D.C., MONTAGE's headquarters is a large multi-story mixed use residential and commercial building with a U-shaped driveway and a covered entrance that opens into a lobby with a security desk.  A picture of the exterior of the PREMISES is below:



52.     MONTAGE's offices are located on the first floor, in Suite AG-50 of the above building.  The PREMISES are accessed by entering through the main doors, passing the security

desk, and taking the corridor on the first floor to the left.   A picture of the exterior of MONTAGE's business entry-space at Suite AG-50 is located below:



53.   MONTAGE's entrance way is accessed through a dark-framed door with a large glass panel.  The words "ECKANKAR Reading Room" are printed on the glass in blue.  Above the door there appears to be a camera or other security system apparatus.  To the right of the door, about five feet from the floor, is a sign that says "AG-50."

54.   Based on my investigation, I submit that multiple factors demonstrate that the door is purposely mislabeled, and the above photograph does in fact denote the entrance to MONTAGE's Washington, D.C. corporate offices:

a.   First, a check of MONTAGE's public website (www.montageinc.com), conducted on September 16, 2020, shows that MONATGE reports that it "is a Woman Owned firm based in Washington, D.C."  Under the "contact" section of the webpage, MONTAGE lists

the PREMSIES as its business address.  Moreover, MONTAGE lists its phone number as 202-332-0186, which resolves to the address at the PREMISES when cross-referenced with telephone utility records.  And, MONTAGE has informed the Government that the PREMISES is both MONTAGE's physical address, and mailing address, through their registration with the government's General Services Administration ("GSA") System for Award Management ("SAM") contracting system.

b.      Second, a review of the Eckankar website, on September 10, 2020, shows that there are three "Eckankar Reading Rooms" situated across the country, and none of these three are located at the PREMISES.

c.      Third, according to the most recent bank statements I have reviewed, from February 2020, MONTAGE pays the rent for this location.

d.      Fourth, on September 8, 2020 I contacted the State Department, Diplomatic Security, Security Infrastructure Directorate, Office of Information Security, and spoke to the Industrial Security Chief ("SECURITY CHIEF-1").  SECURITY CHIEF-1 informed me that the State Department security offices are familiar with MONTAGE from previous security incidents at the 3636 16th Street NW, Suite AG-50 address, from several years ago, and knows the PREMSIES to be the corporate headquarters as represented to the State Department. SECURITY CHIEF-1 confirmed that as recently as September 8, 2020, the Department of Defense ("DoD") Defense Counterintelligence and Security Agency ("DCSA") confirmed an active Top Secret facility clearance for the PREMISES address, with a Secret level clearance for documents.[14]

---

[14] I note that the Facility Security Officer ("FSO") for the PREMISES was listed as Analisa LLESES, a MONTAGE employee for whom MONTAGE previously represented a fraudulent

e.    Fifth, FORMER EMPLOYEE-2 reported in sum and substance that the PREMISES are basically a front location that appear to be used primarily by MONTAGE to store documents.   FORMER EMPLOYEE-2 reported that LOCATION-1 is the location where the MONTAGE employees actually work on a daily basis.   FORMER EMPLOYEE-2 further stated that every morning while he was employed by MONTAGE, he and other MONTAGE employees would meet in the lobby of the PREMISES in Washington, D.C., and then take a bus to a covert MONTAGE business location at LOCATION-1 in Maryland.   LOCATION-1 is not reported by MONTAGE anywhere as its public office space.   Thus, similar to the PREMISES, LOCATION-1 also contains a misleading name on its entrance: "ASAM," or the American Society of Addictive Medicine.   A picture of LOCATION-1 is below:

---

work history and engineering experience.   For example, in 2016, LLESES's resume was submitted for the contractually-required key role of Construction Security Manager on the Madrid, Spain project, at which time MONTAGE claimed that LLESES had five years' experience with MONTAGE.   In actuality, at this time, LLESES had no construction experience at all, and had only worked for MONTAGE for approximately three months.



Thus, both of MONTAGE's corporate office spaces are publicly mislabeled.

   f.   Finally, even though the bulk of employees work at MONTAGE's "hidden" non-public Maryland office space at LOCATION-1, it is clear that the PREMISES are still used to conduct MONTAGE corporate business.   The PREMISES are MONTAGE's corporate mailing address and the location from which MONTAGE employees are bused to their workspace at LOCATION-1.   The PREMISES are where the State Department directs its correspondence for MONTAGE construction projects.   And MOAYEDI is present at the PREMISES nearly every work day.  For example, since on or about August 29, 2020, I have been following MOAYEDI's personal movements by tracking the estimated GPS position of his

cellphone provided by AT&T.[15]  These movements show that MOAYEDI generally follows a Monday through Friday work schedule, and over the last few weeks, typically departed from his residence and subsequently arrived at LOCATION-1, during the hours between 8:30 a.m. and 11 a.m. on Mondays through Fridays.  From LOCATION-1, MOAYEDI then frequently travelled to the PREMISES, where he spent several weekday hours.  For example, below is a representative snapshot of GPS tracking for MOAYEDI's cellphone locations on September 9, 2020.  Although there is some deviation, these movements are typical of the locations where I have observed MOAYEDI's cellphone over the past few weeks during business hours:

| | |
|---|---|
| 0927 hrs.: | MOAYEDI Residence (Chevy Chase, MD) |
| 0938 hrs.: | Montage, Maryland (LOCATION-1) |
| **1258 hrs.:** | **Montage, D.C. (PREMISES)** |
| **1446 hrs.:** | **Montage, D.C. (PREMISES)** |
| 1808 hrs.: | MOAYEDI Residence (Chevy Chase, MD) |

**Additional Evidence of MONTAGE's Use of Electronic Devices at the PREMISES**

55.    As noted, during the course of the investigation, I interviewed FORMER EMPLOYEE-3.  FORMER EMPLOYEE-3 stated that, in late 2015 or early 2016, State Department security personnel came to the PREMISES for a one-day meeting.  FORMER EMPLOYEE-3 stated that, when MONTAGE found out that State Department security personnel were coming for the meeting, MONTAGE management instructed employees to hide computers, papers, and documents in a closet.  Additionally, MONTAGE rented "clean"

---

[15] This information was obtained pursuant to a GPS cellphone warrant and order signed by United States Magistrate Judge Sarah L. Cave in the Southern District of New York on or about August 28, 2020.

computers to stand in for their regular computers, so it would appear that MONTAGE was following standard security protocols.

56.     In addition, FORMER EMPLOYEE-2 stated that, during his approximate one-month assignment in Washington, D.C. in May or June of 2017, he learned that the PREMISES was primarily used to store documents.  However, FORMER EMPLOYEE-2 also stated that Montage Chief Financial officer (CFO) Nader Golpayegani's work location was at the PREMISES, where classified information was also stored.  I reviewed emails that were sent to OBO from Nader Golpayegani's email address (Golpa@montageinc.com) as early as October 2014.  In the emails, Golpayegani was sending certifications of payment on behalf of Montage projects in Guayaquil, Prague, and Madrid through at least 2018.  Some of these emails are from May 2017, the approximate timeframe during which FORMER EMPLOYEE-2 identified Golpayegani as working at the PREMISES.

57.     On or about September 28, 2018, personnel with the U.S. Department of Homeland Security—Homeland Security Investigations (HSI) conducted a border search of FORMER EMPLOYEE-5 (the Guayaquil Project Director) after he landed from Guayaquil at Miami International Airport in Miami, Florida.  Paper documents in FORMER EMPLOYEE-5's possession included multiple logs entitled "Montage Electronic Devices Onsite Guayaquil MSGR 2015-2018".  As detailed in the photograph below, in these logs, dozens of pieces of electronic equipment, which had once been on site at the GUAYAQUIL PROJECT, were cataloged by type, make, and serial number.  For example, at least approximately 18 laptops, 4 tablets, and numerous printers were included.  Additional columns indicated the "date wiped" for certain GUAYAQUIL PROJECT devices, or the "date removed," for certain devices.  Moreover,

numerous notations as to the current storage status/location of some of these electronic devices included entries indicating that the devices had been relocated to "Montage HQ," which I believe denotes the PREMISES:

| Type of Device | Make/Model | Serial No. | Date Wiped | Date Destroyed/ Removed |
|---|---|---|---|---|
| | | | | Montage Electronic Devices Onsite - Guayaquil MSGR 2015-2018 |
| Blank CDs | N/A | N/A | *N/A* | All Used |
| BRADY LABEL | BMP 21 PLUS | PGM 211613809260 | *N/A* | Montage HQ |
| Computer | Samsun Note 3 | SMN900A | | Montage HQ | Sep 2017 |
| CPU | Lenovo/TS140 | 11S0B94352ZVJ8864C | | September 25 ※ |
| External Back Up | CGATE | Q12053108C5 | | Mont M HQ | MAK 2017 |
| External Back up | My Passport Ultra | WX41AB4AFJHA | | | |
| External Back Up | Radioshack | NT2500 | | | |
| External Back Up | SeaGate | 2GE1WBMS | | | |
| External CD | HP | 427430502654 | | All Used |
| Flash Drive | Imation / Swivel 16 GB | 5112227125 | | M HQ |
| Fusion Slicer | ARC | 03034 | *N/A* | Montage HQ. |
| HARD DRIVE | TOSHIBA/ MQ01ABF050 | S/N | | |
| LAPTOP | ASUS/GL551JW | F7NOCJ07114131A | | June log | September 25 ※ |
| LAPTOP | ASUS/GL552V | FBN0CV416179461 | | June 15 |
| LAPTOP | Dell | E6510 (CFL6YN1) | | Montage HQ |
| LAPTOP | Dell | E6510(1HRSTM19) | | Montage HQ |
| LAPTOP | Dell | E6510(BRB34Q1) | | Montage HQ |
| LAPTOP | Dell | 16871231666 | | Montage HQ. |
| LAPTOP | DELL - LATITUDE E6440 | 9530N32-1989844067D | | |
| LAPTOP | DELL /INSPIRON | P20G001 | | Air conditioner Configuration. |
| LAPTOP | Dell Inspiron 14 | BMVT432 | | |
| LAPTOP | DELL/ INSPIRON 15-55 | 274893019 | | Allan's Computer. |
| LAPTOP | DELL-PP18L | 6210 | | |
| LAPTOP | HP Pavilion | 003726000000000AA171 | | Air Conditioner configuration |
| LAPTOP | HP/15-1010WM | 5CD4357JMB | | |
| LAPTOP | LENOVO / 20138 | CB22566901 | | |
| LAPTOP | Lenovo/G550-70 | YB06624779 | | Montage HQ (trash) |
| LAPTOP | Samsung SM T350 | R52J50GSE6D | | |
| LAPTOP | Sony Vaio | PCG7132P | | |
| LAPTOP | Toshiba Satellite | 3F0583595 | | Montage HQ. |

*Dell tatitude E5470*

1 of 2

58.     In sum, based on my interviews with former employees, surveillance conducted by agents working on this investigation, my review of subpoenaed documents, my review of publicly available documents and web-based information, and GPS tracking of MOAYEDI's cellphone, I submit that there is probable cause that the PREMISES contain electronic devices used in furtherance of the SUBJECT OFFENSES.  First, there is probable cause that MOAYEDI conducts MONTAGE business at the PREMISES, given (1) MOAYEDI's regular, multi-hour presence there, including consistently this month; and (2) MOAYEDI's frequent use of electronic devices in furtherance of the Subject Offenses, such as his submittal of false documents using a computer (as noted above) and his use of Dropbox (also noted above). Second, as noted throughout this Affidavit, the crimes under investigation have involved the repeated use of computers, email, and cellphones—*e.g.*, through fraudulent submittals, electronic submission of payment applications, doctored electronic documents, a forged business license, unauthorized use of an electronic signature, modification of architectural drawings, and the unauthorized use of Dropbox.  Third, based on the foregoing, I submit that there is probable cause that MONTAGE (1) conducts business at the PREMISES, even though it is not the primary day-to-day workspace of most employees; (2) has a work station at the PREMISES, as supported both by Montage CFO Golpayegani's working there regularly in spring 2017, and by MOAYEDI's regular presence at the PREMISES; and (3) keeps electronic equipment at the PREMISES (such as equipment associated with the Guayaquil Project), whether for purposes of storage, for purposes of deceiving the State Department (as in late 2015 or early 2016), or both. Fourth, because the PREMISES are MONTAGE's only address of record with the State Department (for at least the past decade), it is reasonable to infer that MONTAGE has electronic

equipment at the PREMISES that would permit MONTAGE to review sensitive or classified information—or at least to give the appearance that this is the location at which MONTAGE views such materials.  This is supported by FORMER EMPLOYEE-2's statement that classified information was stored at the PREMISES.  Lastly, as Montage has been in business since 1986, it is reasonable to believe that just as it archives documents at the PREMISES, it likely archives computers, discs, and other electronic equipment there.

59.     If the proposed warrant is granted, among the items that will be the subject of the search will be evidence of forged as-built drawings and plans relating to the GUAYAQUIL PROJECT and other projects, evidence of possible use of Dropbox for classified or sensitive documents, evidence of actual ownership of MONTAGE, evidence regarding employee qualifications and forged resumes, and evidence of identity theft of non-MONTAGE employees, including VICTIM-1.  Among the places that I expect to find such information at the PREMISES include in computers or electronic devices, in MONTAGE's books and records, in MONTAGE's electronic files and email communications, and in MONTAGE's hard copy, paper files, and construction documents and plans.

## **TECHNICAL TERMS**

Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

34

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

36

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer

software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the

connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely

identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

       m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

       n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

       i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

o.     "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network- hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.     "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

60.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B).  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully

submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

a.      In my experience, individuals who engage in criminal activity, particularly when fraud is involved, often do so by using computers or other electronic devices, by among other things, using digital devices to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; to retain contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; to transmit stolen financial and personal identification data, including names, addresses, telephone numbers, social security numbers and resumes of other individuals; and to keep records of these transactions.  Thus, for example, much of the evidence discussed in connection with the SUBJECT OFFENSES herein is electronic in nature (*e.g., see supra* ¶¶ ---, forged construction plans were submitted to State Department electronically; *supra* ¶¶ ---, sensitive and potentially classified construction information was transferred electronically through unauthorized cloud computing system; *id.* ¶¶ ---, forged final drawings submitted to State Department electronically; *id.* ¶¶ ---, identity theft by misappropriating the resume of a third party may have involved electronically editing the resume).

b.      Moreover, individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old

digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

            c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

61.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.   Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.   Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive,

45

memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team

46

and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

        f.      I also know that when an individual uses a digital device to commit a crime, such as the uploading of forged submittal documentation, or the transfer of sensitive or classified information via Dropbox, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

62.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-

text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in

criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

    f.  Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

  63.  The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

    a.  Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

      1.  Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed

capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES.  The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to

be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## **CONCLUSION**

64.     I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,



_____
Christopher D. Swenson
Special Agent
United States Department of State –
    Office of Inspector General

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)
(3) on this 18th day of September, 2020.

_____

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE