# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>4227 JENIFER ST., N.W., WASHINGTON, D.C. AND<br>ELECTRONIC DEVICES THEREIN | )<br>)<br>)<br>)<br>)<br>) |

Case No. ___21-sw-145___

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____Columbia_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. sec. 201, 371, 666, 1001, 1031, 1346, 1956; 31 U.S.C. sec. 5324 | Bribery of public officials, conspiracy to defraud U.S., federal programs bribery, false statements, major fraud against U.S., honest services fraud, money laundering, and structuring |

The application is based on these facts:

See Attached Affidavit of Special Agent Christopher Swenson

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Christopher Swenson*
*Applicant's signature*

Dept. of State-OIG Special Agent Christopher Swenson
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means)*.

Date:   May 19, 2021

_____
*Judge's signature*

City and state:   Washington, D.C.

Robin M. Meriweather, United States Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means     ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  21-sw-145 |
| 4227 JENIFER ST., N.W., WASHINGTON, D.C. AND | ) | |
| ELECTRONIC DEVICES THEREIN | ) | |
| | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A hereto

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B hereto

**YOU ARE COMMANDED** to execute this warrant on or before _____ June 1, 2021 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     May 19, 2021 _____        _____

*Judge's signature*

City and state:   Washington, District of Columbia _____        Robin M. Meriweather, United States Magistrate Judge

*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-sw-145 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>**4227 JENIFER ST., N.W., WASHINGTON, D.C. AND ELECTRONIC DEVICES THEREIN, and**<br><br>**MAY SALEHI,**<br><br>**UNDER RULE 41** | SW No. <u>21-sw-145</u> |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Christopher D. Swenson, Special Agent of the U.S. Department of State ("State Department"), Office of the Inspector General ("OIG"), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the individual known as MAY SALEHI ("SALEHI") and the premises known as 4227 Jenifer Street, N.W., Washington, D.C., (hereinafter the "PREMISES"), further described in Attachment A, for the things described in Attachment B.

2.      I have been employed as a Special Agent with the State Department for over seven years.  During that time, I have conducted complex, multinational investigations and have made arrests for complex financial crimes involving money laundering, identity theft, wire fraud, visa fraud, and bank fraud.  Based on my training and experience, I am familiar with the use of electronically stored information in such investigations.  During my career, I have participated in

the execution of numerous search warrants involving documentary and electronic evidence.  I have received numerous certifications in computer and mobile device forensics, attended training in white collar fraud, and completed approximately 27 weeks of New Agent Training at the Federal Law Enforcement Training Center in Brunswick, Georgia, and the Diplomatic Security Training Center in Dunn Loring, Virginia.

3.     Prior to my employment with the State Department, I was a sworn officer with Homeland Security Investigations, and served as a police detective and supervisor with the City of Newburgh, New York, police department, where I was assigned to investigate homicides, robberies, and gang conspiracy cases.  I have a total of approximately 20 years of law enforcement experience and have made over approximately 700 arrests.  As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or all of the knowledge of others, about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18 of the United States Code, Sections 201 (bribery of public officials), 371 (conspiracy to defraud the United States), 666 (federal programs bribery), 1001 (false and fictitious statements), 1031 (major fraud against the United States), 1346 (honest services fraud), and 1956 (money laundering), and Title 31 of the United States Code, Section 5324 (structuring) (the "Subject Offenses"), have been committed by MAY SALEHI and other co-conspirators.

2

## PROBABLE CAUSE

### Overview

6.      Since in or around June 2018, I have been investigating government contract fraud and associated misconduct related to a company known as Montage, Inc. ("Montage"). Montage is a U.S.–based business incorporated in 1986, which is primarily involved in worldwide Government construction projects, including embassies, military posts, consulates, and similar overseas properties owned and operated by the United States Government.  Montage has performed over approximately $220 million dollars in contracting work for the U.S. Government, including for the Department of Defense, the Department of Justice/Federal Bureau of Investigation, the State Department, the Department of the Interior, the Department of Agriculture, NASA, the EEOC, and the Department of Veterans Affairs.  Since in or around 2014, Montage appears to have focused primarily on competing for and obtaining contracts with the State Department.   During that period, the State Department has awarded Montage approximately six critical infrastructure projects involving U.S. Embassy/Consulate construction contracts totaling approximately $100 million.  These projects included locales such as Ecuador, Spain, Sudan, the Czech Republic, and Bermuda.[1]

7.      This ongoing investigation has revealed that Montage and its principals have engaged in a wide range of fraudulent practices, including, among other things, misrepresentations about ownership, financial condition, personnel, and having the qualifications necessary to complete construction projects; identity theft; and misrepresentations in tax filings.

---

[1] A review of bank records shows that Montage routed several hundred wire transfer payments through the Southern District of New York to support its business operations abroad.

As part of this scheme, Montage employed various means and methods of defrauding the Government.

8.       One aspect of Montage's multifaceted fraud scheme was cultivating a State Department insider, including paying lucrative bribes to that State Department employee in exchange for confidential State Department information.  This State Department insider worked in the Department's Overseas Building Operations group ("OBO"), which gave her access to information extremely valuable to Montage, and gave her the opportunity to help steer certain overseas business to Montage.  In addition to her access and opportunity, she had a strong incentive to share confidential information in exchange for payment: She was in long-term, substantial financial distress in her personal life.  Montage appears to have exploited this opportunity.  Prior to 2013, Montage was a general government contractor that performed construction for a wide array of governmental entities, including the State Department; indeed, an overseas project for the State Department nearly bankrupted Montage in or around 2012.  Yet in or around 2014, Montage's business model significantly changed: Montage appears to have transformed from a general government contractor, to a company that nearly exclusively performed overseas construction for the State Department—the precise type of project that had just nearly bankrupted Montage, but also the precise type of project for which an OBO insider would be especially valuable.  From 2014 through 2017, Montage had the tremendous good fortune to win six major overseas contracts with the State Department, worth approximately $100 million.  I believe that these developments are explained by the existence of a State Department insider who had an illegal relationship with Montage and received bribes from Montage in or around both 2014 and 2016/2017.  A cooperating witness—a former Montage employee who personally participated in the bribe scheme in 2016/2017—has confirmed the

payment of bribes during that period.   Indeed, the investigation has revealed that the four individuals involved in the bribe scheme in 2016/2017—Montage's principal, two middlemen, and the State Department insider—were all born in Iran; they had interconnected relationships; and Montage's principal reportedly met the State Department insider through an Iranian community group.

9.     The State Department insider is MAY SALEHI.  The present application is for a search of SALEHI's physical person, as well as for the items listed in Attachment B and believed to located at her residence (*i.e.*, the PREMISES).

## Background: The Federal Construction Industry

10.     Based on my investigation to date, including my review of documents and conversations with others, I am generally aware that various agencies within the federal government pay millions of dollars annually in order to build and repair various federal buildings, including offices, barracks, embassies, and consulates.  I further know that various entities, including Montage, particularly focus their business on bidding federal construction projects.  Generally, in connection with a given project, the Government issues requests for proposals or a public invitation that is intended to solicit a project estimate, or "bid," for that project.  In many projects, the companies that wish to compete for Government business are asked to submit sealed bids, such that the various bidders do not know what their fellow competitor companies have estimated the project will cost to complete.  This type of solicitation is known as competitive sealed bidding—which is intended to avoid corruption and collusion, as well as to maximize taxpayer value by affording the Government several independent estimates to choose from.  Such bids typically factor in many considerations, including the project's size, complexity, nature, location, timeline, and perceived prestige; the costs of raw materials, labor,

and shipping to complete the project; and how much profit the company seeks—or is willing to forego in an attempt to underbid its competitors.  After a public invitation, the solicitation period is typically held open for a period of time, and then the Government conducts a public opening of the sealed bids, to be followed by a public award of the bid.  While Government contracting is complex, broadly speaking, the purpose behind this type of competitive bidding procedure is to ensure that the Government has the opportunity to award the bid to the lowest qualified bidder—although it may not always be obligated to do so.[2]

*   *   *

11.     The sections that follow are divided into two primary parts: Part One relates to Montage, its principal Sina Moayedi, its multifaceted fraud scheme, and a highly counterintuitive change in its business model.  Part Two relates to the State Department insider, MAY SALEHI.

_Part One: Montage, Moayedi, Widespread Fraud, and a Highly Counterintuitive Development_

**Background: Sina Moayedi**

12.     Based on my investigation to date, including my review of documents and publicly filed corporate information, and interviews I have conducted with multiple Montage employees (or former employees), I know that Sina Moayedi ("Moayedi") is the founder and owner of Montage, that Moayedi is the controlling entity behind Montage, and that Moayedi makes all material decisions on Montage's behalf.  From these same sources, I also know that since at least 1995, Moayedi has falsely represented to the Government, to the state of Maryland,

---

[2] For example, the lowest bidder may be deemed unqualified; for instance, if the bidder cannot meet the requisite bonding requirements, if the bidder does not have the necessary experience or security clearances, or if the bidder's proposal is otherwise defective.  To avoid this issue, in some situations, the Government may conduct pre-screening of applicants' qualifications, and then provide bidders the opportunity to submit a final bid after the screening, which increases the likelihood that the lowest bidder will be eligible to be awarded the project.

and to other authorities that various individuals were the "President" of Montage, in order to claim that Montage was a minority owned (and sometimes female-owned) business. The investigation has revealed that, on and off for more than 25 years, Montage has claimed to have multiple minority "owners" at different points in time, but in fact, they were all figureheads, as Moayedi controlled the company at all times.[3]

## 2008-2012 Nigeria Project: Montage Almost Goes Bankrupt

13.    Based on my participation in this investigation, including my interviews of various former Montage employees and my review of State Department records, I am aware, among other things, that in or around 2008, Montage won a State Department project in Lagos, Nigeria worth approximately $26.1 million. This project involved the design and construction for both a partial renovation of, and a new addition to, the U.S. Consulate in Lagos, Nigeria, including a perimeter security upgrade. A review of documents indicates that this project was estimated to be completed by October 2010, but Montage did not finish it until in or around early 2012.

14.    Based on my interviews of various former Montage employees, I am aware that this project nearly bankrupted Montage and caused Moayedi to terminate most employees because he could no longer afford them. For example:

   a.    One former Montage employee explained, in substance and in part, that:

---

[3] As reflected herein, I believe that Moayedi was and always has been the owner and principal of Montage, and that others have served as his alter ego/nominee for the purposes of conferring minority and/or woman-owned business status on Montage. My investigation has confirmed that by asserting this alleged minority "status," Moayedi secured for Montage unfair material advantages when seeking contracts with the State Department and other Governmental entities. For example, for many Government contracts, "certified" women-owned businesses must be awarded 5% of a contract's total dollar value.

       i.     The Lagos, Nigeria project was problematic for Montage;

       ii.    The job was bigger than Montage could handle;

       iii.   Montage almost went bankrupt during that project; and

       iv.   Montage laid off everyone other than Moayedi and a former financial officer.

   b.  Another former Montage employee (specifically, the former financial officer referenced in the paragraph above, "Former Financial Officer-1") stated, in substance and in part, that:

       i.     Former Financial Officer-1's role in the Nigeria project evolved from a security-type escort to assistant project manager, despite a lack of qualifications for the latter role; and

       ii.    After the Nigeria project, Moayedi invited Former Financial Officer-1 to lunch, during which Moayedi (1) started crying, complaining that Montage was failing; (2) explained that he was forced to fire everyone, because he did not have the money to pay them; and (3) asked Former Financial Officer-1 to come back to Montage, to help fix the company.

   c.  Montage's former outside accountant and CPA ("CPA-1") likewise confirmed, in substance and part, that the Lagos, Nigeria project had many problems, which threatened to bankrupt Montage.

15.    Based on my review of Intuit business records, I am aware of the following, among other things:

   a.  In or around 2010, 2011, and most of 2012, there were various individuals on

Montage's payroll.

    b.   However, from in or around November 2012 until mid-March 2014, the only Montage employee on the payroll (or receiving a paycheck) was Sina Moayedi.

I believe this contrast further confirms these witnesses' statements that Montage was nearly bankrupted following the Nigeria project and laid off nearly all of its workers.

16.    As set forth in the next section, despite nearly going bankrupt from the State Department's Nigeria project, Montage did not subsequently shy away from State Department projects. To the contrary, following the Nigeria debacle, Montage appears to have transformed its business model so that it relied almost exclusively on State Department projects thereafter—indeed, the exact type of overseas, complex, U.S. embassy/consulate project that Montage had just been nearly decimated by.

**2014: Montage's Business Model Appears to Significantly Change**

17.    Based on my review of federal construction contract records, I am aware that Montage's business model appears to have significantly changed in or around 2014. Prior to that time, Montage performed construction projects for a wide swath of governmental entities, including but not limited to the Department of the Navy, the Department of the Army, the Department of the Air Force, the Nuclear Regulatory Commission, NASA, the EEOC, the Public Buildings Service, the FBI/Department of Justice, FEMA, the Bureau of the Fiscal Service, the Employment and Training Administration, the National Park Service, and the State Department. Prior to in or around 2014, Montage completed approximately $59.6 million in construction projects for the State Department. But it also completed significant projects for, among other

agencies, the Navy ($30.8 million, in total), the Public Buildings Service ($10.5 million, in total), the Army ($8.5 million, in total), and NASA ($6.5 million, in total).  From approximately 1993 to 2012, construction for the State Department appears to have represented (in dollar amounts) approximately 50% of Montage's total revenue stream—approximately $59.6 million out of $118.1 million.

18.     Starting in or around 2014, Montage's business model overwhelmingly shifted to construction for the State Department specifically.  For example, in terms of overall revenue, between 2014 and the present, the State Department paid Montage about $106.5 million, in total (and $105.1 million was during only 2014-2017).  During the same period, other executive branch agencies paid Montage less than about $5 million—combined.  From 2014 to the present, construction for the State Department therefore represented more than approximately 95% of Montage's executive branch revenue stream (approximately $106.5 million of $111.4 million). Montage thus appears to have transformed from a company that, for decades, had been a general government contractor, to a company that nearly exclusively performed construction for the State Department.

19.     Between in or around 2014 and 2017, Montage won six major, lucrative contracts with the State Department to build U.S. embassies or consulates overseas.  In other words, although Montage was nearly bankrupted by the complex, overseas, State Department project in Lagos, Nigeria, it responded by promptly refocusing virtually its entire business on complex, overseas, State Department work thereafter.  As discussed below, I believe that these seemingly counterintuitive developments are explained by the existence of a State Department insider who had an illegal relationship with Montage.

## The September 2020 Montage Search Warrants

20.     Montage primarily operates out of two corporate office locations in the Washington, D.C. area.  The first location ("Premises-1"), in Washington, D.C., is the only location that Montage lists as its corporate headquarters, and holds out to the public as its primary business location.  However, Montage also operates a second "secret" location in Chevy Chase, Maryland ("Premises-2"), which is unknown to the public, and where nearly all of Montage's employees work on a daily basis.

21.     On or about September 23 and 24, 2020, I, along with other Special Agents, executed a series of judicially authorized search warrants relating to Montage.  Among the premises searched were Premises-1; Moayedi's home in Chevy Chase, Maryland; and the secret Premises-2 office suite in Chevy Chase, Maryland, which was purchased through a shell company and which had a sign by the entrance with the name of another entity ("ASAM," which stands for American Society for Addictive Medicine), *not* Montage.  Numerous paper documents and other items of relevance were seized, particularly from Premises-2; along with nearly 40 computers, numerous peripheral drives, USB drives, external hard drives, several cellphones (including two that appear to have belonged to Moayedi), and an approximately 96-terabyte server.[4]

---

[4] These search warrants predated the discovery of the potential involvement of a State Department insider; accordingly, the Subject Offenses (at that time) included conspiracy to defraud the United States, major fraud against the United States, wire fraud, bank fraud, conspiracy to commit wire and bank fraud, aggravated identity theft, money laundering, false statements, perjury and false declarations before a court, and the unauthorized removal and retention of classified materials.  *See* Exhibit A (Search Warrant Application and Warrant in the District of Columbia, which are incorporated herein by reference).

22.     I personally participated in the search of Premises-2.  Shortly after securing that premises, I introduced myself to Sina Moayedi and explained, in substance and part, that agents were present to execute a search warrant.  Moayedi was also advised, in substance and part, that he was not under arrest—and that he was free to stay or free to go, and free to call his attorney; he was also informed that if he left the premises, he would not be allowed back during the search.  Moayedi requested to speak with counsel, and I facilitated his request by retrieving his counsel's phone number.  Another agent and I informed Moayedi that he should consult with his attorney, and that the investigative team would be willing to listen if he had information he wished to convey to us at a later time.  I specifically stated that if Moayedi, for example, had information about a Government insider, that it would be something we would be very interested to hear.  Moayedi's demeanor and expression changed immediately, as he raised his head and made direct eye contact with me, stating in substance, "I think I understand what you're asking: You want to know if I'm paying someone in the State Department?"  Agents stated they would be interested in that, but again informed him that this would need to be coordinated through his attorney.

23.     No arrests were made at the time of these searches (nor have any been made thus far), but agents interviewed several Montage employees.  During these interviews, Montage's bookkeeper ("Bookkeeper-1") blamed a Montage former financial officer (Former Financial Officer-1) for the cause of Montage's problems, suggesting that Former Financial Officer-1 had embezzled money from the company.  In a separate interview with a Montage executive ("Executive-1"), Executive-1 also blamed Former Financial Officer-1 for embezzling funds from the company.

24.     Notwithstanding the claims of Bookkeeper-1 and Executive-1, the investigation

has revealed that Montage continued to engage in fraudulent conduct following the departure of Former Financial Officer-1 from Montage in 2018. To give one example, in or around April 2019, the State Department terminated Montage's construction contract for the Madrid, Spain Embassy for non-performance. However, from my review of subpoena returns from Montage's primary bank ("Bank-1"), I learned that Montage later represented to Bank-1 (in connection with Montage-1 line of credit with Bank-1) that Montage was approximately 47% done with the Madrid, Spain project, had earned approximately $7 million, and anticipated earning approximately $6 million more from this project. All of these statements were false, because Montage had already been terminated at the Madrid Embassy project.

25. From Bank-1 subpoena returns, I also learned the name of the individual who served as Montage's longtime outside accountant and CPA ("CPA-1"). Subsequently, both Former Financial Officer-1 (who served as Montage's in-house accountant) and CPA-1 (who served as Montage's outside accountant) were informed that they are subjects of this investigation, and both are now attempting to cooperate with the Government.[5]

**The Interview with Former Financial Officer-1**

26. On or about October 9, 2020, I and an SDNY Special Agent interviewed Former Financial Officer-1 at his residence in Maryland. During this interview, I read Former Financial Officer-1 Montage corporate documents including an email in which CPA-1 blamed Former

---

[5] Specifically, both Former Financial Officer-1 and CPA-1 have admitted that they engaged in multiple financial frauds at the direction of Moayedi. Both have participated in separate proffer sessions with the Government in the hopes of obtaining leniency. To date, the information that these individuals have provided has been extensive, relevant, and generally reliable—and has been corroborated in many respects by other witnesses I have spoken to, and by numerous corporate financial documents I have reviewed, including Montage and Moayedi's corporate tax returns.

Financial Officer-1 for Montage's problems ("Email-1").  For example, in substance and part, CPA-1 wrote that Former Financial Officer-1 embezzled money from the company, alleged that Former Financial Officer-1 was an alcoholic, and claimed that Former Financial Officer-1 had mental health problems.  At one point, CPA-1 wrote, in substance and in part, that: "A trusted employee of many years was able to cover up his embezzlement of funds by creating an entire phony universe of Quickbooks, payroll, receivables, payables and bank account statements. . . . [T]he manipulation of the Company's books and financial statements was a cover up for the embezzlement. . . .  He prepared phony invoices of all kinds, phony bank statements, phony bank reconciliations, phony payroll reports.  He took payroll under assumed names."[6]

27.     Upon learning that numerous Montage employees were blaming Former Financial Officer-1 for Montage's issues, Former Financial Officer-1 reported that Montage and Moayedi were engaged in widespread deception and fraud, and further, implicated himself in a number of Montage's schemes.  Among other things, Former Financial Officer-1 stated that Moayedi was a "master forger" and described how Moayedi and another Montage employee would electronically alter Bank-1 documents to alter bank account balances, and then provide those altered documents to bonding companies.[7]  Former Financial Officer-1 also stated that Moayedi and others had forged resumes.

28.     In addition, Former Financial Officer-1 stated that Montage kept at least four separate sets of books and records, and admitted that s/he had assisted Moayedi by perpetuating this fraud.  Former Financial Officer-1 stated, in substance and part, that the purpose of keeping

---

[6] As discussed below, CPA-1 later reported to us that this email was written solely based on information that Moayedi had provided to CPA-1.

multiple sets of books was to satisfy different capital and earnings requirements for different entities.  Thus, for example:

 a. Montage kept one set of books for Bank-1.  These records contained accurate records regarding cash-on-hand, since Bank-1 could easily verify deposit amounts by conducting simple due diligence on Montage's bank accounts.

 b. Montage kept a second set of books for the bonding company.  These records overstated Montage's income and showed more cash-on-hand than Montage actually had, which had the effect of lowering the cost of Montage's construction bond.

 c. Montage kept a third set of books for another bonding company, the purpose of which was similar to the second set described in subparagraph (b) above.

 d. Finally, Montage kept a set of fraudulent books for the Internal Revenue Service ("IRS"), in which Moayedi frequently understated his and Montage's income.[8]

29. In support of these claims, Former Financial Officer-1 produced a partial set of Montage records with separate "tabs," and showed us how the tabs separated each set of Montage's fraudulent books and records as outlined above.  Former Financial Officer-1 also

---

[7] Generally, all State Department projects required a bond or a surety, the cost of which was borne by the contractor, and was intended to guarantee satisfactory completion of the project.

[8] Montage is an "S-Corporation" which means that its earnings are passed through to the owners, and are reported on the owner's tax returns.

confirmed that CPA-1 was Montage's long-time outside accountant.[9]  Former Financial Officer-1 further stated that CPA-1 knew about Montage's multiple records scheme, and was likely to maintain complete sets of these records at the location where CPA-1 maintained CPA-1's practice.  Former Financial Officer-1 added that CPA-1 only signed *one* of the four sets books, because CPA-1 wanted to "save his ass."  However, in the binder provided by Former Financial Officer-1, each set of books and records has a cover letter, on CPA-1's letterhead and from CPA-1, representing that the set of records complies with standard accounting principles.

30.      Former Financial Officer-1 also noted that there was a purported tax form that accompanied each set of books and records.  Former Financial Officer-1 personally showed me two versions of the same tax form, which differed markedly, depending on to whom Moayedi was submitting the document.  The particular document at issue—which was merely an example—was a Form 1040 from tax-year 2016.  In the version that Moayedi submitted to Bank-1 in connection with maintaining his line of credit, Moayedi reported earning approximately $2.6 million in income.  However, in the version of the form which Moayedi submitted to the U.S. Government, Moayedi reported earning only a fraction of that—approximately $375,000—which, of course, would have reduced his tax obligation.[10]

---

[9] And indeed, financial records reveal repeated large payments from Montage to CPA-1.  For instance, in 2019 alone, Montage paid CPA-1 at least approximately $66,000.  Moreover, telephonic records reveal approximately 13 contacts between Moayedi's known cellphone number and CPA-1's telephone/fax numbers—which appear to be a residential landline numbers—between in or around October 2017 and June 2020.

[10] On or about October 16, 2020, we executed a search warrant on CPA-1's home in Massachusetts.  Soon after, CPA-1 began cooperating, in which CPA-1 confirmed most aspects of Former Financial Officer-1's testimony to us.  CPA-1 also stated that CPA-1 was told by Moayedi that Former Financial Officer-1 was an alcoholic and an embezzler, and therefore the information that formed the substance of the allegations in Email-1 had been provided to CPA-1 by Moayedi.  CPA-1 also indicated that, in some years, Moayedi had understated his income to the IRS, but in other years, Moayedi had actually *over*stated his income to the IRS in part in

*Part Two: MAY SALEHI*

**The State Department Insider**

31.     The above information provides background and context regarding the worldwide, multi-million dollar fraud that Montage is engaged in—a fraud that appears to have accelerated once Montage shifted its business model nearly exclusively to doing work for the State Department in or around 2014.  Moreover, as stated, in the course of my investigation, I discovered probable cause to believe that Moayedi had cultivated and bribed a State Department employee who received payments in exchange for committing corporate espionage against the Government, on behalf of Moayedi and Montage.

32.     During the October 2020 interview, Former Financial Officer-1 revealed that Moayedi had cultivated a career employee at the State Department, and Former Financial Officer-1 believed that Former Financial Officer-1 had assisted Moayedi in paying that person bribes in exchange for intelligence regarding Government contracts.

33.     Former Financial Officer-1 stated that s/he did not recall the insider's name, but did recall that she was Moayedi's female "Iranian friend" in the State Department, who had assisted Moayedi and Montage in successfully bidding and being awarded at least one Department project that s/he was aware of.  Former Financial Officer-1 indicated that Moayedi knew this "Iranian friend" from a community group relating to Iranian heritage.

    a.      **The Identification of MAY SALEHI**

34.     Former Financial Officer-1 recalled that Former Financial Officer-1 had met the insider at a pre-bid conference in Slovenia a few years ago and believed her to be a State

---

order to ensure that his representations to the State Department (which had inflated Montage's profitability) were consistent with his representations to the IRS.

Department project manager or project director. Former Financial Officer-1 also recalled that the insider helped Moayedi with the attainment of a State Department project "in the Caribbean," which Former Financial Officer-1 believed was possibly Bermuda.

35.    Former Financial Officer-1 also reported that s/he understood that the insider had met with Moayedi in Virginia and had informed Moayedi that Montage was the lowest bidder on this project, but had substantial room to upward revise its bid while still winning the project. The insider proposed that Montage upward revise its bid by $300,000, kicking 20% or $60,000, back to the insider as a "commission." Former Financial Officer-1 stated that Moayedi agreed to this arrangement, and requested that Former Financial Officer-1 accept a Montage check from Moayedi in connection with this scheme. Former Financial Officer-1 reported that s/he then cashed the check and provided the funds to a third party (later determined to be Seyed Marvastian), for delivery to the insider. In order to hide the reason for the payments, Former Financial Officer-1 reported that s/he understood that the State Department insider was supposed to provide Marvastian with a Persian rug worth about $2,000 in case "anyone asked" about the exchange.

36.    Montage appears to have won the Hamilton, Bermuda contract by employing this method. Specifically, I reviewed the State Department's 2016 procurement records for the Compound Security Upgrade ("CSU") project in Hamilton, Bermuda, and confirmed that there were five offerors (i.e., bidders) whose proposals were technically acceptable, including Montage's; one of these offerors is based in the Southern District of New York. In reviewing the Price Negotiation Memo, I learned that the qualified offerors were sent letters with an opportunity to submit final bids on or about September 19, 2016. As Former Financial Officer-1 had reported, on or about September 21, 2016, Montage submitted a final bid that was

significantly higher than its original bid ($6,307,320 vs. $5,389,500—a nearly $1 million increase).   Moreover, a letter accompanying the revised proposal was sent to the State Department by Moayedi, explaining that: "We reviewed our proposal and upon further inspection we discovered that there was an arithmetic error in our estimate worksheets…"   And as Former Financial Officer-1 had reported, despite this large increase, Montage was still the lowest bidder and was awarded the project.[11]

36. 37.     I then queried State Department travel records for employees who had traveled to Slovenia, and I identified a pre-bid construction conference that occurred in January 2016, in Ljubljana, Slovenia.   I cross-referenced the approximate date range with international travel by Former Financial Officer-1, and confirmed that Former Financial Officer-1 was also out of the country during that period.   Of the two female State Department employees identified as attending this pre-bid conference, only one worked for Overseas Building Operations ("OBO"), which, according to OBO's website, "directs the worldwide overseas building program for the Department of State and the U.S. Government community serving abroad."   This person was MAY SALEHI.   I reviewed Department records on SALEHI and learned that SALEHI is employed as an Engineer in the State Department's OBO Project Development and Coordination Division, European division.

38.     I reviewed SALEHI's United States Passport applications from February 2015 and January 2020, and learned that SALEHI's country of birth was Iran, thus corroborating

---

[11] In connection with overseas construction projects, the State Department has a Technical Evaluation Panel (TEP) consider all aspects of an offeror's plan to execute the project.  The TEP has the power to disqualify an offeror.  SALEHI oversaw the TEP for the Hamilton, Bermuda project awarded to Montage.

another detail provided by Former Financial Officer-1.  In addition, I determined that SALEHI resides less than one mile from Montage's secret office in Chevy Chase, Maryland.

### b.  SALEHI's Financial Distress

39.     Based on my review of various records, I believe that MAY SALEHI was in financial distress during the period from at least in or around 2008 to 2017:

a.  Based on my review of SALEHI's June 2020 SF-86 security clearance form, I learned, among other things, that SALEHI and her husband divorced in December 2007, just months after SALEHI secured an approximately $1.5 million 30-year mortgage for her residence in Great Falls, Virginia, requiring nearly $10,000 in monthly mortgage payments.  A review of SALEHI's 2020 SF-86 security clearance investigative form showed SALEHI had not had contact "for over ten years" with her husband.

b.  Based on my review of State Department records, I learned, among other things, that SALEHI's gross salary from the Department in 2008 was approximately $9,333 per month.  In other words, her monthly mortgage obligation exceeded her monthly *gross* salary—which also does not account for further reductions in income due to income taxes, day-to-day living expenses such as food, and other incidentals.

c.  Based on my review of SALEHI's State Department emails, I learned, among other things, that during approximately December 2008 extending into 2009, SALEHI began to receive solicitations for loan modification options on her state.gov email account.  Some of these emails contained the address for SALEHI's primary residence at the time.  Based on employment

with the State Department, I know that the State Department employs filter systems on its government email, such that it is uncommon to receive "junk mail" on the state.gov network unless one directly provides her email address or subscribes using her email address. Therefore, I have reason to believe that SALEHI began to feel financial pressure at least as early as this time, which included SALEHI looking at options to modify the mortgage on her $1.5 million dollar home.  Indeed, in response to receiving such a solicitation, SALEHI forwarded it to a personal msn.com email account in June 2009, further demonstrating her interest.

d.  Further, based on my review of subpoenaed bank records, I know that, in or around March 2010, SALEHI began to correspond with a particular bank ("Bank-3") about a mortgage modification.  A review of Bank-3 mortgage documents showed that, on or about February 1, 2011, SALEHI received a mortgage modification with the lender for her primary residence, which was then in Great Falls, Virginia.  The unpaid principal balance as of the agreement was $1.5 million.  The modification appeared to allow SALEHI to merely make "interest only" payments for a time.

e.  Based on my review of State Department Federal Credit Union records, I learned, among other things, that SALEHI purchased a low mileage Porsche Boxster convertible in or around April 2014, seeking a loan in the amount of approximately $25,000, payable over a 60-month period.  However, SALEHI paid this loan off early, paying $15,292 in a lump-sum payment in December 2015.

f.  Based on my review of Central Mortgage Company records, I further learned that, on or about June 1, 2016, SALEHI wrote them and stated, in substance and part: *"In the past two years…I requested the bank to review my current loan and provide me with better terms so I can stay in the house I've owned for 19 years. My current mortgage is $9,125 and I can no longer afford to meet this payment with the income I have…"*[12]

g.  On or about June 27, 2016, Central Mortgage Company issued SALEHI a notice of default. SALEHI sent the bank a letter shortly thereafter on or about July 11, 2016, evincing her intent to "short sale" the house.

h.  Based on my review of a Central Mortgage Company document entitled "Borrower Assistance Request Form," I know, among other things, that SALEHI made the following declarations, among others, to the mortgage lender under penalty of law on or about August 8, 2016:

   i.  Her bank account value totaled $520.00;

   ii.  Her monthly obligations totaled approximately $18,000 while her monthly gross income totaled approximately $8,094; and

   iii.  SALEHI checked a particular box and thereby represented that her situation constituted a "long-term or permanent hardship."

On or about September 12, 2016 SALEHI received a letter from the lender's attorney in an attempt to collect mortgage debt owed in the amount of

---

[12] Of note, in 2016, Salehi was at the maximum salary and step for her position, making almost $2,300 per month more than when she began to be responsible for paying the mortgage in 2007.

$1,504,863.14.  Ultimately, during March 2017, a short sale was completed on the Great Falls, Virginia property.

### c.  The 2016/2017 Bribe Payments

#### i.  SALEHI's Phone Contact with Moayedi and Marvastian (2016/2017)

40.      I also reviewed SALEHI's aforementioned U.S. Passport applications from 2015 and 2020.  I observed that SALEHI had indicated on both passport applications that her cellphone number was 703-926-9648 (the "9648 Number").[13]  I reviewed cellphone records provided by Sprint and confirmed that SALEHI was the subscriber for the 9648 Number.  When I cross-referenced the 9648 Number with toll records on Moayedi's known cellphone, I observed a significant contact between SALEHI's personal 9648 Number and Moayedi's cellphone: SALEHI's cellphone called Moayedi's cell phone for a 4-minute conversation on or about September 19, 2016.  This date precisely corresponded with the date referenced above, on which the State Department opened a window for offerors to submit final bids for the CSU Bermuda project (the "Bermuda Project").  I also noted that throughout December 2016, and through January, February, and March 2017, SALEHI had significant phone contacts with Marvastian, the person who was suspected of being a "middleman" between Moayedi and SALEHI.[14]

41.      Further illustrating the close links between the three conspirators, on or about April 1, 2017, SALEHI's 9648 Number called Marvastian.  After that, Marvastian called

---

[13] The 9648 Number is Salehi's personal cellphone, not a Government-issued cellphone.

[14] I know Marvastian's cellphone number in part because it is listed in his SF-86 form from 2009 as well as in his U.S. Passport application from 2012.  In addition, Marvastian's cellphone number is also listed in Moayedi's cellphone (under the name "Fred Marvastian"), which phone was seized in September 2020 pursuant to a judicially authorized search warrant.

Moayedi.  Then, there were two additional calls between Marvastian and SALEHI's phones, all on the same day.

42.    I also reviewed the contact list for Moayedi's iPhone seized on or about September 23, 2020, pursuant to a judicially authorized search warrant.  I saw that the 9648 Number—SALEHI's personal cellphone number—is present in Moayedi's contact list under the name "May Salehi," and there is also an additional phone number of 703-875-6370, which I know to be SALEHI's desk phone number.  The "organization" which Moayedi had listed for SALEHI is "Obo", which I believe denotes the State Department's OBO division.  Also in Moayedi's contact list is the name "Fred Marvastian," which is associated with Marvastian's cellphone number.  (The investigation has revealed that "Fred" appears to be a nickname for "Seyed Marvastian.")

### ii. Financial Analysis and SALEHI's Structuring Financial Transactions

43.    As mentioned, Former Financial Officer-1 referenced that the payments from Montage went through a middleman before they were paid to SALEHI.  Based on this information, I reviewed bank records from Montage's primary bank, Bank-1.  I discovered various payments made payable to either "Seyed M. Marvastian," "Seyed Mahmood Marvastian," "Payvand Homes," or "Payvand LLC."  In total, between July 2013 and January 2017, Montage made at least approximately seven payments to one of the Payvand entities (Homes or LLC), and Montage made at least approximately 13 payments to Marvastian.  These 20 payments totaled approximately $119,122.90.[15]  (Some of these payments contained no "memo line" entry; others contained entries including "Final payment for Anna's house,"

24

"NASA Wallops," or "Loan Payment".)  Several, but not all, of the checks to Payvand were in round dollar amounts, such as $20,000 and $10,000 in January 2017, and $5,000 and $3,000 in July 2013.  The payments to "Marvastian" were not round-dollar amounts, but one payment to "Seyed M. Mervastian" (spelled one letter differently) was for $25,000.  Three of the round-dollar check payments are pictured below for reference:



Date:12/14/2016 Account:3010011994 Amount:$25,000.00
TR:56004445 Sequence:8169829150 OnUs:Y CaptureSite:0



Date:01/11/2017 Account:3010011994 Amount:$10,000.00 S
TR:56004445 Sequence:8206755490 OnUs:Y CaptureSite:004

---

[15] Some of these payments theoretically could have been salary payments to Marvastian, who is believed to have worked at Montage for at least some of this period.



Date:03/09/2017 Account:3010011994 Amount:$20,000.00
TR:56004445 Sequence:8280248480 OnUs:Y CaptureSite:0(

44.     My review of Maryland Secretary of State records and public website information

shows that during the relevant time period, Marvastian was the signatory and registered agent for

a company called Payvand LLC, and he is currently the signatory and registered agent for a

related company called Payvand Homes.[16]   In addition, in Moayedi's iPhone, the "Fred

Marvastian" contact includes an email address info@Payvandhomes.com, further connecting

Marvastian to Payvand.   I reviewed bank records from "Bank-2," which I determined serviced

Marvastian's bank account for Payvand LLC during 2016 and 2017.   There, I observed two

checks deposited into Marvastian's Payvand LLC account from Montage, Inc.   The first was

dated January 6, 2017, in the amount of $10,000, and was deposited on or about January 10,

2017.  The second was dated January 11, 2017, and was deposited on or about March 8, 2017.

---

[16] Notably, Payvand Homes' construction business shares an address with Montage.  A public
website advertising Payvand Homes lists an address for Payvand Homes that is one of the same
locations that was leased by Moayedi, and was a target premises in our search warrant on or
about September 24, 2020.  *See*, *e.g.*, https://www.houzz.com/professionals/kitchen-and-bath-
remodelers/payvand-homes-pfvwus-pf~1325857596 (last visited May 14, 2021).

Additionally, Marvastian received $8,000 in cash back from Bank-2 during the second transaction. Further review of bank records showed a check written from the Bank-2 account to a different account called "Payvand LLC," in the amount of $5,000.  In the "memo" portion of this check, "May-Montage" was written, which I believe refers to the bribe payments at issue involving MAY SALEHI and Montage, Inc.  A second check was identified as being drawn from the Payvand Bank-2 account on March 16, 2017 and written to "Seyed M. Marvastian."  In the "memo" portion of this check, "May/Montage" was written (which I again which believe refers to bribe payments at issue involving MAY SALEHI and Montage, Inc.), thereby confirming the link between Moayedi, Marvastian, and SALEHI.  Images of these two checks are referenced below:

45.     I also reviewed phone records for SALEHI's mobile device and Marvastian's mobile device.  I observed a March 9, 2017 call originating from Marvastian (specifically, the phone number referenced on both Payvand checks above, ending in -7272 (the "Marvastian Cellphone") to SALEHI's personal cellphone (the 9648 Number) at approximately 5:33 PM, the day after the $8,000 cash withdrawal was made by Marvastian.   Additionally, between approximately December 10, 2016 and December 17, 2016, SALEHI and Marvastian exchanged approximately seven phone calls between the 9648 Number and the Marvastian Cellphone. SALEHI and Marvastian then exchanged approximately seven additional phone calls between January and April 2017.

46.     Furthermore, from my review of bank subpoena returns, I determined that during the December 2016 to April 2017 timeframe, SALEHI opened a new bank account at Bank-2, and began making cash deposits, as well as deposited at least three thousand dollars in one hundred dollar bills in her State Department Credit Union account.  Periodically throughout 2017, SALEHI continued depositing cash deposits of several thousand dollars in round one-hundred dollar bill increments, in her Bank-2 and her State Department Credit Union accounts, giving me probable cause to believe that she was engaging in the structured depositing of the cash bribe payments transmitted to her by Marvastian; all of SALEHI's known cash deposits in this period were under $10,000, the amount that triggers a bank's filing of a Currency Transaction Report, which can lead to scrutiny of an individual's transactions and potential suspicions of money laundering.[17]

---

[17] Likewise, I reviewed bank subpoenas for a bank from which Salehi was attempting to obtain a mortgage ("Bank-3").  In correspondence dated August 18, 2016, Salehi responded to an inquiry from Bank-3 about her cash deposits.  Salehi's response stated, in pertinent part:  "This letter provides explanation for the two $2,000 deposit [sic] made on my account during the month of

47.     Finally, my investigation uncovered a further link between Marvastian and Montage.  Based on my review of employment records, and interviews with current and former employees, I determined that prior to owning Payvand, both Marvastian—and at least one other Marvastian family member—were Montage employees.  For instance, in Marvastian's SF-86 form in or around May 2009, he indicated that he was a then-current Montage employee.

### d.  The Apparent 2014 Bribe Payments

48.     Having confirmed the apparent payment of bribes to SALEHI in the 2016/2017 period, I began investigating whether SALEHI may have received bribes at an earlier stage, as well.  For the various reasons set forth below—which include State Department records, call records, bank records, and payroll records—I respectfully submit that there is probable cause that Montage also paid SALEHI bribes in or around the second half of 2014, during a period that was approximately contemporaneous with Montage's winning three overseas State Department projects in the July 2014 to September 2014 period.

49.     *Montage Wins Three Overseas Projects*: By way of context, based on my review of State Department records, I know that Montage won three overseas State Department projects in the July 2014 to September 2014 period.  The approximate timeline for each project was as follows, including two significant events in the second half of July 2014:

    a.   Guayaquil, Ecuador project ($16.1 million):

        i.   June 4, 2014: The State Department publicly advertised this project;

---

July 2016.  The first deposit is a rent check . . . and the second $2,000 deposit is from the sale of a Persian rug.  As a result of downsizing, I have been trying to sell my furniture and rugs.  Hope the explanation is adequate."  Thus, although this correspondence predates Montage's upward revision of its CSU Bermuda bid by a month, it lends further credence to Former Financial Officer-1's information, because it corroborates that Salehi was selling a Persian rug.

     ii.   July 17-19, 2014: The pre-construction meeting was held in Ecuador;

     iii.   September 10-16, 2014: The Technical Evaluation Panel convened; and

     iv.   September 27, 2017: Montage was awarded the project.

   b.   Copenhagen, Denmark project ($4.4 Million):

     i.   July 28, 2014: Task order offered to four companies for bidding interest;

     ii.   August 13-14, 2014: The pre-construction meeting was held in Denmark;

     iii.   September 10-15, 2014: the Technical Evaluation Panel convened; and

     iv.   September 24, 2014: Montage was awarded the project.

   c.   Abu Dhabi, UAE project ($1.3 Million):

     i.   April 30, 2014: Task order offered to five companies;

     ii.   May 20-21, 2014: The pre-construction meeting was held in UAE;

     iii.   June 30, 2014: The Technical Evaluation Panel convened; and

     iv.   July 3, 2014: Montage was awarded the project.

The Guayaquil, Ecuador project was especially large in scope, complexity, and dollar-amount.  It is especially surprising that a company which, as noted above, had only one employee (Moayedi) from November 2012 until mid-March 2014 would win such a large contract.

   50.   *SALEHI and Moayedi's Phone Contacts During This Period*: Based on my review of toll records for Moayedi's cellphone number, I am aware that, between in or around January 2010 and July 22, 2014, there were zero phone calls or SMS messages sent between Moayedi's

known cellphone and the 9648 Number.  However, beginning on or about July 23, 2014 there

were several contacts between Moayedi and SALEHI's devices:

- On or about July 23, 2014, at 5:58pm, SALEHI placed a call to Moayedi, which lasted 5 minutes and 4 seconds;

- On or about July 23, 2014 at 6:48pm, Moayedi placed a call to SALEHI, which lasted 56 seconds;

- On July 24, 2014, at approximately 12:27pm during a work day, Moayedi sent a text message to SALEHI;

- On or about July 24, 2014, at approximately 12:31pm during a work day, SALEHI sent a text message to Moayedi; and

- On or about July 25, 2014, at approximately 11:09am during a work day, SALEHI sent a text message to Moayedi.

In other words, after appearing to exchange zero calls or text messages (at least on these two

phone numbers) for several years, SALEHI and Moayedi had a sudden flurry of activity between

July 23 and July 25, 2014—which was less than one week after the pre-construction meeting was

held in Ecuador for the aforementioned $16.1 million project (July 17-19, 2014)—and which

was less than one week before the Copenhagen, Denmark project was publicized (July 28, 2014).

51.    *Montage Pays Marvastian Tens of Thousands of Dollars During This Period*:

Moayedi's phone contacts with SALEHI were not the only sudden development in this period;

Montage also suddenly started paying Marvastian around the same time—even though

Marvastian appears *not* to have been on Montage's payroll.

a.    By way of context, I reviewed Montage's Intuit records for the period encompassing very late 2010 through part of 2020, and I found *zero* instances in this nearly 10-year period in which Marvastian's name appeared on the Montage payroll or as having received a paycheck.

b. However, Montage's Bank-1 account records (for the period from January 2013 through early 2020) reveal several conventional checks payable to Marvastian.  These checks to Marvastian occur during only two periods— July-December 2014, and (as noted) December 2016—two periods during which there is probable cause that Montage routed bribe payments through Marvastian to SALEHI.

c. Specifically, Montage's Bank-1 account records reveal that, between January 2013 and June 2014, Montage issued zero checks to Marvastian (though it did pay Payvand, as noted above, in 2013).  But from July 18, 2014 through December 5, 2014, Montage issued Marvastian approximately 12 checks, totaling approximately $46,877.17.  The first of these checks was dated July 18, 2014—the exact time that the pre-construction meeting was held in Ecuador for the aforementioned $16.1 million project (July 17-19, 2014). Marvastian deposited this check on or about July 23, 2014—the exact day that Moayedi and SALEHI each called each other, with one call lasting more than five minutes.

d. Montage's 12 checks to Marvastian in 2014 were generally in the amount of $4,275.43, $4,275.44, or $4,275.45, but some were for approximately $2,000. Montage's checks to Marvastian were issued at irregular intervals, ranging from 3 days to 25 days between checks.  This manner of payment appears inconsistent with standard salaried work, which frequently is on an approximately biweekly pay schedule.  Indeed, Montage appears to have paid employees' salaries biweekly, based on Montage's Intuit records.

52.     In sum, I respectfully submit that there is probable cause that Moayedi and Montage bribed SALEHI in 2014 by routing bribe payments through Marvastian, given that: (1) Montage suddenly won 3 State Department overseas projects in the same two-month period that Moayedi and SALEHI had a sudden flurry of telephonic contacts; (2) Montage suddenly started paying Marvastian tens of thousands of dollars in this same period, despite not paying him for lengthy periods before and after (and despite Marvastian's not being on their payroll); (3) Montage, still reeling from its near-bankruptcy, had a significant financial incentive to bribe SALEHI to win more than $20 million in lucrative State Department contracts; (4) SALEHI, in substantial financial distress, had a significant incentive to accept bribes; (5) Montage executed a dramatic shift in business model around this time; (6) as noted below, SALEHI used her official government email account in a highly suspicious fashion; and (7) the same three individuals (Moayedi, Marvastian, and SALEHI) were involved in lucrative bribe payments in 2016/2017, as noted above.

### e.  SALEHI's False Statements

53.     SALEHI also apparently lied on her SF-86 security clearance application by failing to disclose her improper contacts with Marvastian and Moayedi, thereby jeopardizing her access to classified information.

54.     As part of this investigation, I have also reviewed SALEHI's annual financial disclosure forms for 2014 through 2020.  SALEHI also apparently lied in annual financial disclosure forms by failing to report the payment of bribes to her.  (By contrast, in certain years,

she reported a residence as an asset, a loan as a liability, and various stocks or similar as assets.)[18]

### f. Review of SALEHI's Official State Department Email Account

55.    Based on my review of emails in MAY SALEHI's official State Department email account (SALEHIMM@state.gov),[19] I learned, among other things, that: (1) SALEHI likely knew of Montage and Moayedi (in her professional capacity) as early as 2006, as Montage was bidding State Department projects at that time; (2) at least since November 2011, SALEHI has repeatedly forwarded emails, including "trip reports," from her official State Department email account to one of her personal email accounts (mmsarch@msn.com (the "SALEHI Personal Email Account-1")), in apparent violation of State Department policy; (3) SALEHI appears to have occasionally used her personal email account to conduct official business; and (4) SALEHI had access, through her official email account, to information highly valuable to Montage, including relating to civil litigation between Montage and the State Department regarding the Bermuda Project—and on at least one occasion, SALEHI appears to have

---

[18] Relatedly, among the materials we are requesting permission to seize are SALEHI's tax-related documents and filings, which are likely to contain either (implicit) admissions of her having received bribe payments, or false statements in an attempt to conceal the bribery scheme, just as she appears to have done in her State Department financial disclosure forms.

[19] Pursuant to the Foreign Affairs Manual, which sets forth State Department policy, "Employees have no expectation of privacy while using any U.S. Government-provided access to the Internet.  The Department considers electronic mail messages on U.S. Government computers, using the Internet or other networks, to be government materials and it may have access to those messages whenever it has a legitimate purpose for doing so."  *See* 5 FAM 723(4); *see also* 1 FAM 053-1.1(a)(1) ("As necessary for carrying out the duties and responsibilities provided by the Inspector General Act of 1978, as amended, the Inspector General is authorized to . . . Have prompt access to all records, including access to all electronic data bases, reports, audits, reviews, documents, papers, recommendations, or other material available to the Department.").

participated in a meeting or conference call with Montage and its counsel.  Each of these four points are elaborated on next.

56.     *First*, based on my review of MAY SALEHI's official State Department email account, I have determined that SALEHI likely knew of Montage and Moayedi (in her professional capacity) by 2006, as Montage was bidding State Department projects at that time in New Delhi, India and Abuja, Nigeria.  At least one "Record of Offerors" document, located in SALEHI's email from 2006, specifically lists the name "Sina Moayedi" as the apparent point of contact for Montage.   Similarly, in or around, 2008, SALEHI continued to receive information on solicitations for which Montage was bidding or prequalified to bid, such as a project in Hong Kong.

57.     *Second*, based on my review of MAY SALEHI's official State Department email account, I have determined that SALEHI repeatedly forwarded emails, including State Department "Trip Reports," from her official State Department email account to SALEHI Personal Email Account-1.  Based on my training, experience, and review of these Trip Reports, I am aware that, as a general matter, Trip Reports contain information about the purpose of a given trip, the dates of that trip, the State Department's goals in connection with a particular construction project, and Department employees' observations and key findings, including as to such matters as priorities, concerns, security issues, and finances.  For example:

    a.  On or about November 8, 2011, SALEHI forwarded—from her State Department email account to SALEHI Personal Email Account-1—a State Department Trip Report regarding a Vilinus, Lithuania construction project. Montage was one of the bidders on this project (*i.e.*, the Lithuania project).

    b.  On or about March 9, 2015, SALEHI began preparing for the future Hamilton,

Bermuda Compound Security Upgrade (CSU) project that Montage ultimately won.  This appears to be the earliest known reference, in SALEHI's official State Department email account, of the Bermuda Project.

c.  On or about May 29, 2015, SALEHI forwarded—from her State Department email account to SALEHI Personal Email Account-1—a 13-page Hamilton, Bermuda CSU survey, which detailed project requirements and scope of work. As noted above, Montage ultimately won this project.

d.  On or about January 21, 2016, SALEHI forwarded—from her State Department email account to SALEHI Personal Email Account-1—a State Department Trip Report regarding the Hamilton, Bermuda project (with the actual trip occurring several months earlier, in October 2015).  As noted above, Montage ultimately won this project.

e.  On or about October 11, 2016, SALEHI forwarded—from her State Department email account to SALEHI Personal Email Account-1—a State Department Trip Report regarding the Hamilton, Bermuda project (again, in which the actual trip occurred more than a year earlier, in May 2015).  As noted above, Montage ultimately won this project.

f.  On or about February 21, 2017, SALEHI forwarded—from her State Department email account to SALEHI Personal Email Account-1—a pre-bid conference PowerPoint deck for a proposed project in Montevideo, Uruguay.

g.  On or about February 24, 2017, SALEHI forwarded—from her State Department email account to SALEHI Personal Email Account-1—an internal construction schedule document for a proposed project in Montevideo,

36

Uruguay.

h.  On or about November 1, 2017, SALEHI forwarded—from her State Department email account to SALEHI Personal Email Account-1—a State Department Trip Report for a Naples, Italy construction project (which trip occurred more than a year earlier, in July 2016).  This forwarded email also discussed project requirements.

i.  On or about November 1, 2017, SALEHI forwarded—from her State Department email account to SALEHI Personal Email Account-1—a State Department Trip Report regarding the Hamilton, Bermuda project (which trip occurred more than two years earlier, in May 2015).  As noted above, Montage ultimately won this project.

j.  In or around March 2018, SALEHI forwarded—from her State Department email account to SALEHI Personal Email Account-1—a State Department Trip Report regarding a construction project in Lyon, France (which trip occurred in November 2017).  This email discussed project requirements/observations.

k.  In or around October 2020, SALEHI forwarded—from her State Department email account to SALEHI Personal Email Account-1—a Statement of Work for the Chief of Mission Residence in Iceland.

A number of these emails contained information about either project requirements, internal construction schedules, or scope of work.  As noted, many were forwarded long after the trip in question.  Given that forwarding internal Government documents to a personal email account is generally against State Department policy, it is exceedingly difficult to think of any valid reason

37

why SALEHI would have forwarded these emails from her official State Department email account to SALEHI Personal Email Account-1.[20]  In particular, forwarding trip reports so long after the conclusion of the trip itself tends to negate any suggestion that SALEHI was merely "taking her work home with her," and therefore forwarded these emails for the purpose of finishing up State Department business from home.  On the other hand, transferring these documents from her State Department account to SALEHI Personal Email Account-1 would have certain benefits for someone engaged in selling Government information.  For example, such transfers would allow SALEHI to print hard copies for later dissemination without any State Department oversight; in addition, forwarding such emails would also allow SALEHI to provide others with inside information (as she did with the Bermuda Project), or to potentially "prove" to someone else that she had access to confidential project information.   Of particular note, Montage was a bidder for several of the projects associated with these forwarded emails, including the Vilinus, Lithuania project, as to which SALEHI forwarded an email to SALEHI Personal Email Account-1 on or about November 8, 2011; and the Hamilton, Bermuda project, which Montage bid and won.

58.    *Third*, SALEHI appears to have occasionally used SALEHI Personal Email Account-1 to conduct official business.[21]  For example:

a.  In or around February 2010, SALEHI received an email from a design firm regarding the format for an amendment to certain specifications.  SALEHI

---

[20] While the use of personal email accounts to conduct official business is not entirely prohibited by State Department policy, it is discouraged, and "[p]ersonal email accounts are only to be used to conduct official business in very limited circumstances," including but not limited to "[t]emporary system outages."

replied, in substance and part, "it is getting nasty here and I have to leave office / It sound good.. I will communicate with you via my personal email mmsrach@msn.com" (*i.e.*, SALEHI Personal Email Account-1). (This appears to have occurred during a major snowstorm in the Washington, D.C. region.) The recipient responded, in substance and part, "Perfect"[22]:



b. On or about August 19, 2019, SALEHI sent meeting minutes, which set forth a timeline the State Department's Warsaw, Poland CSU project, from the SALEHI Personal Email Account-1 to her State Department email account, also cc-ing the SALEHI Personal Email Account-1. Some of the minutes

---

[21] No communications between SALEHI and Moayedi or Montage were recovered from this email account, based on search warrant returns.

[22] The State Department policy makes clear that, "[w]hen conducting government business, convenience is not an appropriate reason to utilize a personal email account in lieu of an official email account."

discuss the expected scope of work and the estimated project cost.  Montage

was one of the bidders on this project.

Warsaw CSU - Project Cost and schedule update

 MM S <mmsarch@msn.com>
To ⚪ May Salehi; ⚪ MM S

All,
Here is minute of our Monday meeting:

Project RFP was issued July 1, 2017
Pre-bid conference held on July 16-17
Proposal Due date: September 6, 2019

CWE for pre-award has the primary contract increased from $21M to $25M
Amendment 1 issued on Bond & insurance

Amendment 2 issued on the following:

Section C has the following revision:

1 - Work in the CAA area is limited to the perimeter windows:
(5 modified drawings will be issued under a new amendment to reflect the change in CAA area)

2 - Any work  associated with the warehouse  CES will under CLIN 4 (Property is not USG Owned approval is required)
3 - Any work associated with the roof parapet will be under ClIN 5 ( This work will be done with the Fac Roofing contractor in May 2020)
4 - Any work with the TSS new system will be included under CLIN6

CM will review and the project duration with regards to these changes

CM &SM will review and update the project supervision cost based on the following:
   a. removal of scope in the CAA area,
   b. removal of scope for the roof parapet work
   c.  Change in TSS scope of work

Accordingly, it appears that, over the years, SALEHI has conducted some official business via

her personal email account (SALEHI Personal Email Account-1).

59.     *Fourth*, SALEHI had access, through her official email account, to information

highly valuable to Montage, including relating to the Bermuda Project itself, and to civil

litigation between Montage and the State Department regarding the Bermuda Project. For

example:

a. During the approximate 2016 to 2020 timeframe, SALEHI was privy to thousands of internal communications, meetings, and emails regarding the Hamilton, Bermuda CSU project, which (as noted) Montage bid and won with her assistance. Here is one example, which includes details about the contractor, the anticipated project timeline(s), security, and financials:

| | |
|---|---|
| MRN: | 18 HAMILTON 72 |
| Date/DTG: | Jun 01, 2018 / 011134Z JUN 18 |
| From: | AMCONSUL HAMILTON |
| Action: | WASHDC, SECSTATE *ROUTINE* |
| E.O.: | 13526 |
| TAGS: | ABLD, AMGT, ASEC |
| Captions: | SENSITIVE |
| Pass Line: | DEPT FOR OBO/CFSM/CM/CO/EUR, OBO/CFSM/SM/SO/SSO |
| Subject: | HAMILTON COMPOUND SECURITY UPGRADE PROJECT: MONTHLY REPORT – MAY 2018 |

1. (U) SUMMARY OF PROGRESS:
   A. General Updates: Work continues on perimeter wall and EOB window replacement & re-glazing. Concrete deliveries remain tentative, due to local supplier inability or unwillingness to support placement on requested days. No work has yet been performed on the new addition, as Montage intends to finish more of the perimeter wall in order to allow emergency egress via the east side of EOB while work on the new addition is ongoing on the west side. A second cure notice and a letter of concern regarding the Montage safety program were both issued on 14 May. Safety has improved since then.

   B. Interior: Relocation of the consular lobby wall, including installation of 2 new teller windows, was completed after 17 straight days of work, 4-21 May. 10 days had been allotted but due to poor prior planning and a lack of approved shop drawings an additional 7 days were required, during which time Consular Affairs was closed to the public except for emergencies. Post was very accommodating and the wall relocation could not have been accomplished without their assistance. In the EOB a total of 5 windows out of 11 have been replaced, including new sub-frames, and 11 windows out of 14 have been re-glazed. 4 panes were damaged and will be replaced when new ones arrive.
   C. Exterior: South wall steel picket anti-climb fence was installed. Work continued on installation of SS and SD lines west of EOB, ductbanks and manholes. West knee wall foundation is complete and west bollards are 70% complete. New electrical panel in generator room was installed.

END SUMMARY

2. (U) PROJECT PERFORMANCE REPORT:
   A. Contractor: Montage, Inc.
   B. Project Director: Chuck Lowther
   C. Contract number: SAQMMA-14-D-0053
   D. Order Number: SAQMMA-16-F-5043
   E. Project number: XJ-7P-0001
   F. Date of notice of award: 26 September 2016
   G. Date of limited notice to proceed (design/early site): 9 December 2016
   H. Date of final notice to proceed: 5 June 2017
   I. Original completion date: 9 February 2018

41

I. Original completion date: 31 February 2018
J. Approved extensions of time in days: 192
K. Current completion date: 20 August 2018
L. Percent cost complete scheduled (late start/finish): 87%
M. Percent cost complete actual: 35%
N. Original contract amount: $6,307,320
O. Number of modifications and amount: 6/$490,320.79
P. Current contract amount: $6,797,640.79
Q. Contractor's estimate of substantial completion: 24 December 2018
R. PD's estimated substantial completion date: Early 2019
S. PD's estimated certificate of occupancy date: Early 2019
T. Total amount of retainage: $140,000

3. (SBU) SITE SECURITY STATUS:
    A. Status:  47 active badges this month.  Average daily number of workers is 13.  Contractor continues to work
        with SSC to vet local subcontractors. SSC coordinates LAC checks for third country nationals (TCN's).
        Post ARSO conducts background checks for un-cleared American contractors and subcontractors.
    B. CAG's/CST's Onsite: N/A
    C. Security Incidents: 0

4. (U) MONTHLY FINANCIAL SUMMARY:
    A. Construction Management Funds allotted to date: $115,000
    B. Obligations (FY18): $62,532
    C. Available Balance at Post: $52,468
    D. Security Management Funds allotted to date: $100,000
    E. Obligations: $55,528
    F. Available Balance at Post: $44,472
    G. Contract VAT Expended to date: N/A

5. (U) SAFETY:
    A. Monthly personnel hours total: 3,839 (includes office personnel)
    B. Project cumulative personnel hours total: 20,650 (includes office personnel)
    C. Two lost time accidents have occurred to date.


**Signature:**            WORMAN


    b.   Ultimately, Montage sued the State Department relating to alleged non-payment of certain funds relating to the Bermuda Project, which the State Department had withheld in light of alleged issues with Montage's performance.  SALEHI was privy to a number of internal State Department communications about this civil litigation, including apparent conversations about legal strategy against Montage.  It would have been in both SALEHI's and Montage's interest for any civil case *not* to proceed to trial, as the full scrutiny that a full investigation would entail could threaten to expose the Montage/SALEHI bribe scheme.   It therefore appears that Montage and SALEHI's interests were aligned, which would increase the likelihood of (additional) illicit information sharing.  Here is an example of the type of

litigation-related communications SALEHI was privy to—an email from on or

about January 24, 2020:



> Lai, Jimmy <LaiJ@state.gov>    Lowther, Charles A; Regner, Jeffrey A; Rickard, Jeffrey A; Thomas, James G; Salehi, May M ▾
> Hamilton CSU
>
> Agenda for upcoming meeting/teleconference:
>
> 1) current status
>         -Montage appeal of COFD (Retention Release) to CBCA
> 2) path forward
>         -litigate in court
>         -settle outside of court
>         -arbitration?
> 3) project concerns
>         -warranty issues
> 4) any project related topics
>
>
> Jimmy Lai, CFCM
> U.S. Department of State
> 703-875-6020

Indeed, as part of this investigation, I analyzed activities performed on SALEHI's official State

Department computer.  My analysis revealed that, in January 2020, SALEHI's official computer

contained records of internet searches for, among other things, "SCI clearance," "herb for

anxiety," "Kratom herb for anxiety," "Montage construction company litigations," "what is

litigation," YouTube videos about litigation, and "Shiva Hamidinia," and also visited

Hamidinia's LinkedIn page, Hamidinia's firm page, and legal directory information about

Hamidinia.  I am aware that Shiva Hamidinia was Montage's longtime counsel based on my

involvement in this investigation—including my review of documents related to the Montage-

State Department litigation, such as deposition transcripts, as well as my review of a publicly

available docket in a civil case in the District of Maryland between Montage and a subcontractor.

Moreover, it appears that, in March 2020, SALEHI participated in a meeting with Montage and

its counsel.  Specifically, based on my review of the cellphone contents of a Montage employee

(whose phone was seized pursuant to a judicially authorized search warrant issued in the District of Maryland), I am aware that, on or about March 10, 2020, Moayedi sent his employee the following text message: "*Nela please conf call me 1/2 through your meeting with Shiva and May*".  Thus, it strongly appears that there was a meeting involving the following individuals:

> (1)  Montage's principals (Marianela Lugo, a/k/a "Nela," in-person ("*Nela*"), and Sina Moayedi by phone),
>
> (2)  MAY SALEHI ("*May*"), and
>
> (3)  Montage's longtime counsel, Shiva Hamidinia ("*Shiva*").

Importantly, I believe that there was no valid purpose for this meeting.  SALEHI is an engineer at the State Department; her position has no role in litigating or negotiating cases for the State Department, and indeed she was researching "what is litigation" only approximately two months earlier—but she has access to highly valuable information, and was cc'ed on various emails regarding then-ongoing civil litigation between State and Montage.[23]

<p style="text-align:center">*   *   *</p>

In sum, for the foregoing reasons, as well as those that follow, I respectfully submit that there is probable cause that Montage/Moayedi and SALEHI had a long-term, illicit relationship that included Montage/Moayedi's payment of bribes to SALEHI in exchange for confidential State Department information:

> (1)  Montage had significant difficulties with the State Department's Lagos, Nigeria project, which nearly caused Montage to go bankrupt, reportedly brought Moayedi to tears, and required Montage to let virtually all of its employees go; this experience is likely to have demonstrated to Montage/Moayedi, among other things, the importance of knowing which projects to pursue, and which projects not to

---

[23] Ultimately, after agents executed the September 2020 search warrants, Montage dropped its case against the State Department.

pursue—a complicated calculus in a context in which a contractor has imperfect information;

(2)   Despite this near-disaster, Montage thereafter focused its business on precisely this type of largescale, complex, overseas State Department project—even though Montage had previously done construction for a wide array of executive branch agencies, not just the State Department—and had previously done both domestic and overseas projects;

(3)   Although the estimated completion date for the Nigeria project was late 2010, and Montage did not in fact finish it until early 2012, Montage's fortunes improved significantly thereafter, winning six major U.S. Embassy/Consulate projects with the State Department between in or around 2014 and 2017, worth about $100 million;

(4)   Coinciding with Montage's improved fortunes, at the same time, SALEHI was employed by the State Department in the specific group, OBO, that handles *Overseas* Building Operations—the precise type of project that was repeatedly awarded to Montage starting in 2014;

(5)   SALEHI had significant, sudden telephonic contacts with Moayedi in the precise period that Montage's fortunes suddenly changed;

(6)   SALEHI was in significant financial distress for many years, as her monthly mortgage obligation exceeded her gross monthly salary;

(7)   There is no readily discernible valid explanation for SALEHI's forwarding dated, official emails to her personal email account, in apparent violation of State Department policy—but there is a straightforward criminal explanation;

(8)   Analysis of phone records, bank records, payroll records, State Department records, and Former Financial Officer-1's statements demonstrates that SALEHI was paid significant bribes during the 2016/2017 period;

(9)   SALEHI appears to have engaged in a cover-up as well, including by structuring transactions that involved bribe proceeds and lying in official disclosure forms; and

(10)   SALEHI had ongoing access, for many years, to information about a major Montage project (the Bermuda Project) and to significant litigation about that project—information that would be highly valuable to Montage; and she had strong incentives to illegally share information with Moayedi and/or Montage—first, her financial distress, and then, the desire to prevent their illicit arrangement from being exposed.

Finally, there are a number of reasons that a construction company in the federal construction industry might believe it to be exceptionally useful to have an insider.  In particular, having an insider at OBO would assist with both (a) the procurement phase, and with (b) the project execution and logistics phase of a contract.  For example, during the *procurement*, or bidding phase, having access to inside information would enable cheating in the sealed bid process by, among other things, revealing:

- The number of offerors submitting bids in response to a solicitation;

- Specific amounts bid by other offerors;

- The Independent Government Estimate (IGE) for a given project[24];

- Whether offerors were going to be able to revise bids;

- Whether the scope of the project may be expanded or reduced; and

- Specific concerns or priorities of the State Department in connection with a particular project, which might enable a company to present a particularly appealing bid, because it appears to anticipate the Department's concerns/priorities.

In addition, because offerors' bids are evaluated by a Technical Evaluation Panel (TEP)—which considers all aspects of a company's plan to execute the project and can disqualify an offeror—an insider on a TEP could advocate for the company with whom they have an illicit relationship, including disqualifying competitor companies.[25]

---

[24] The IGE is cost data sought by the Government from a third party entity in order to establish the "market value" of a project—essentially, a "lens" through which to evaluate the relative fairness of offeror's bids.

[25] Indeed, Salehi oversaw the TEP for the Bermuda Project that was awarded to Montage.

Furthermore, during the *project execution/logistics* phase, having access to information regarding project execution and logistics information would further provide an inside edge regarding, among other things, the following:

- Identification of prospective OBO personnel on site, which would allow an offeror to determine whether that OBO employee is a known entity, and if not, to research whether that OBO employee is fastidious in their work, malfeasant, etc.;[26]

- The likelihood that a project's scope may be expanded or contracted; and

- Access to internal communications and viewpoints regarding contractor requests for contract modifications (*i.e.*, how far a company can push an issue affecting their bottom-line).

### The PREMISES Search

60.     The property to be searched is the primary residence[27] of SALEHI, located at 4227 Jenifer St., N.W., Washington, D.C. 20015 ("PREMISES"), and electronic devices located therein.  The PREMISES are further described as a two-story residence (house/duplex) with a basement.  The PREMISES are located on the north side of Jenifer Street, N.W. and the address is identified as "4227" on the front of the house.  The front porch of the house is enclosed with a screen and screen door.  A picture of the exterior front of the PREMISES is attached below:

---

[26] The number of contractors performing overseas work for the State Department, and the number of OBO staff overseeing these projects, is relatively small.  Indeed, based on my review of search warrant returns, I know, among other things, that Moayedi or Montage in fact appears to have researched two OBO employees, including screenshotting one of their LinkedIn pages.

[27] SALEHI is also believed to own other properties, which she is believed to rent to others.



61.     Inside the screened in area, the numbers "4227" are located in black writing on a white background next to the front door, as depicted in the above and below photographs:



62.     Furthermore, I respectfully submit that there is probable cause to believe that SALEHI lives at the PREMISES.  Specifically:

        a.     A review of SALEHI's most recent OGE-450 form—a confidential

financial disclosure report filed by certain executive branch employees file, including SALEHI—indicated that her home address is the PREMISES.  SALEHI filed this form earlier this year, on or about January 28, 2021.

b.      A Postal Inspector with the United States Postal Inspection Service informed me that U.S.P.S. parcels addressed to SALEHI—and sent to the PREMISES—have been sent as recently as on or about April 19, 2021, May 3, 2021, and May 7, 2021.

c.      Public database checks show that SALEHI purchased the PREMISES in 2016, and apparently refinanced this purchase in or around April 2020, as the deed to the PREMISES in SALEHI's name was re-recorded at that time.  (There were no other transfers of ownership.)

d.      On or about April 16, 2021, Special Agents employed by the United States Attorney's Office for the District of Columbia observed SALEHI's known vehicle (a 2015 BMW coupe, with a Washington, D.C. license plate GA6048) parked at the PREMISES (*e.g.*, in its driveway).  On or about May 10, 2021, Special Agents employed by the State Department Office of the Inspector General observed the same vehicle parked at the PREMISES.  A review of the license plate information showed that this vehicle was re-registered to the PREMISES on or about February 28, 2021.  A database check of the license plate found that the vehicle was registered to May Mehrnoosh Salehi at the address of the PREMISES.

e.      A commercial database check listed SALEHI as the current resident of the PREMISES, as of on or about March 25, 2021.

f.      A bank statement for a TD bank account indicates that SALEHI's address is the PERMISES as of December 31, 2020.

49

**Additional Evidence of SALEHI's Use of Electronic Devices at the PREMISES**

63.     This application seeks authorization to seize the items listed in Attachment B, including various known and unknown electronic devices that are owned by SALEHI and may be located at the PREMISES, or on SALEHI's person, as the case may be.  As set forth below, I respectfully submit that there is probable cause to believe that SALEHI has used numerous electronic devices during the relevant time period, that many of those devices are likely to be located at the PREMISES or on SALEHI's person, and that those devices are likely to contain relevant evidence of the SUBJECT OFFENSES.

64.     In particular, without limiting the Government's authority to seek electronic devices not listed below, the Government seeks at a minimum to seize the following ten devices at the PREMISES, or on SALEHI's person:

| date reg received | registration source | product description | part number |
|---|---|---|---|
| 2013-11-13 18:02:36 | ios | IPHONE 4S WHITE 8GB CDMA-SPRIN | MF270LL/A |
| 2015-11-27 19:33:38 | iCloud | MBP 13.3/2.5/2X2GB/500/SD-USA | MD101LL/A |
| 2016-01-09 15:20:24 | iCloud | IPHONE 6 SILVER 16GB SPRINT-USA | MG6A2LL/A |
| 2017-04-09 21:06:28 | iCloud | IPHONE 7 JET BLACK 128GB-USA | MN8Q2LL/A |
| 2018-01-31 02:22:02 | iCloud | IPHONE 6S SPACE GRAY 32GB AT&T- | MN0M2LL/A |
| 2018-11-25 01:58:15 | iCloud | IPHONE 6S SPACE GRAY 32GB AT&T- | MN0M2LL/A |
| 2019-08-07 00:03:54 | iCloud | IPHONE 7 BLACK 32GB AT&T-USA | MN9D2LL/A |
| 2020-06-18 11:55:02 | iCloud | IPHONE 7 BLACK 128GB-USA | MN8L2LL/A |
| 2020-08-19 20:35:02 | iCloud | LOANER,IPHONE 7,MM,32GB | 661-08256 |
| 2020-09-01 15:10:16 | iCloud | IPHONE 11 WHITE 64GB SPR-USA | MWK12LL/A |

65.     The origin of this list is as follows.  During the course of this investigation, I reviewed various electronic search warrant returns relating to SALEHI.  For example, on or about March 5, 2021, the Honorable Robert W. Lehrburger, a United States Magistrate Judge in the Southern District of New York, authorized a search warrant for the contents of a particular email account associated with SALEHI, and the contents of SALEHI's Apple iCloud account associated with the same email address (the "iCloud Warrant").  The search warrant returns from the iCloud Warrant revealed the information listed in the chart above, including the registration

date that SALEHI registered her various iPhone devices with Apple, and the actual part number associated with each device.

66.     Moreover, there is strong evidence that SALEHI is likely to have operated additional electronic devices from the PREMISES.  In particular, a review of Apple iCloud data from the iCloud Warrant showed a "log" of sign-ins by SALEHI to "Apple Media Services" (or "AMS"), which is one of the services that Apple uses to provide functionality to its customers. This AMS log captures, among other things, the date and time that a device associated with a user or a user account accessed the AMS service, as well as the Global User Identifier ("GUID") for the device accessing the service.  A GUID is a pseudo-random 128-bit number used to identify user accounts, documents, hardware, software, and other items by virtue of assigning that device a unique fingerprint.  An examination of the AMS logs present in the iCloud Warrant return showed 10 unique GUIDs associated with the SALEHI iCloud account, accessing Apple services between November 2013 and March 2021. Furthermore, a careful examination of these logs show that the GUIDs associated with the AMS logs are likely additional devices used to access Apple services over periods of time—and are likely not the list of iPhones already known to be associated with SALEHI, as listed in paragraph __ above.

67.     For example, the GUID associated with "cd3aa5ba4598c7b25a3565e8ff90a113e469d8e6" is a singular device that first accessed Apple services on or about April 8, 2017, and continued to access Apple services through late 2020. But during this same time frame, SALEHI had approximately seven different iPhones associated with her Apple account.   In another example, the GUID associated with "12315dbec2d80a9d52894763189ed8a752ab44c8", is a unique device that first accessed Apple services during October 2019 and continued to access Apple services through March 2021—a

time period during which Salehi had approximately five iPhones associated with her Apple account.  It is therefore my belief that the ten unique GUIDs correspond wholly or in part to several current or previously used laptop or desktop computers in SALEHI's home—*i.e.*, the PREMISES—that were running Apple software and/or iTunes-Apple software utilized in part to manage, backup, and restore data from various iPhones.

68.     Given that these lists of devices go back to 2013, and the relevant conduct in this investigation spans approximately the same time period, this application seeks the seizure of all of the known devices listed above, as well as any other unknown electronic devices located at the PREMISES or on SALEHI's person.  Based on my participation in this investigation, it is likely that SALEHI may have used multiple devices to communicate with co-conspirators, or otherwise used these electronic devices in other ways to further the scheme, such as by sending official State Department documents from her work accounts to her personal devices.

69.     By way of further example, from my investigation of this case, and from my review of records from Sprint, I know that SALEHI has maintained the same cellular telephone number, 703-926-9648 (the "9648 Number"), for nearly 20 years.  Furthermore, based on my training and experience, I know that SALEHI is likely to have transferred that telephone number from device to device, including across the devices listed in the chart above, as certain of those devices became obsolete.  I further know from my training and experience that many individuals keep old cellphones at their PREMISES, even when they are not actively being used, because they may contain contact lists, photographs, or other information that the user desires to keep.

70.     From my participation in the investigation of this case, and from my review of the contents of MOAYEDI's cellphone (which was seized pursuant to a judicially authorized search warrant in the District of Columbia), I also know that as stated previously, there is evidence that

over the relevant time period SALEHI has maintained contact with Sina MOAYEDI's cellphone. For example:

a. The 9648 Number is listed in Sina MOAYEDI's cell phone as a "phone" contact. In fact, MOAYEDI's contact list contains both Salehi's personal 9648 Number as well as her State Department desk number, and both were listed under "May Salehi."

b. In addition, SALEHI's 9648 Number also appears in MOAYEDI's "Telegram" encrypted messaging application contact list as "May Salehi." Telegram is a privacy-focused application available for mobile devices, which can also be operated with both Mac and Windows "desktop computer" operating systems.

c. Additionally, I observed recovered data showing that MOAYEDI had sent SALEHI a Telegram message on or about March 17, 2018.

d. Moreover, SALEHI's telephone number appears in MOAYEDI's Skype contact list as "may.salehi" with a username of "Biker 2222." Like Telegram, Skype is a program that can be operated through a mobile device, as well as through a desktop computer with either the Mac or Windows operating system.

e. Similarly, my review of SALEHI's iCloud account revealed that one of her contacts was listed as "Sina" and contained MOAYEDI's known cellphone number.

f. In addition, a search of SALEHI's email account revealed automated messages from as far back as 2014 through 2020 that included references to

updating "Windows," indicating that SALEHI previously owned, or currently owns, a laptop or desktop computer, which among other things, may also contain user evidence relating to the previously mentioned applications such as Skype and Telegram.

g. Lastly, due to the COVID-19 pandemic, since in or around March 2020 State Department employees have been teleworking the great majority of the time from their residence. Teleworking Department employees are capable of accessing State Department resources via a virtual private network (VPN) via virtually any type of device or operating systems. Therefore, devices used to access the State Department network are likely to be located in SALEHI's primary workplace (which is currently the PREMISES), along with work papers, documents, and work product.

71. Accordingly, I respectfully submit that there is probable cause to believe that there are a host of electronic devices in SALEHI's residence (the PREMISES), and that they contain evidence, fruits, and instrumentalities of the SUJBECT OFFENSES.

## **TECHNICAL TERMS**

Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a. "Digital device," as used herein, includes the following three terms and their respective definitions:

1) A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data

storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via

radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

     c.  A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

     d.  A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites

orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.    "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      f.    "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

      g.    Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and

directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.   The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.   "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.   ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.   ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.   ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.   Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.   A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to share files on a computer with other computer

users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.    One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

    i.    When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

    ii.    Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

    o.    "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a

wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network- hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

72.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including

central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B).  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

a.    In my experience, individuals who engage in criminal activity, particularly when fraud is involved, often do so by using computers or other electronic devices, by among other things, using digital devices to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; to retain contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; to transmit stolen financial and personal identification data, including names, addresses, telephone numbers, social security numbers  and

resumes of other individuals; and to keep records of these transactions.  Thus, for example, much of the evidence discussed in connection with the SUBJECT OFFENSES herein is electronic in nature (*e.g.*, *see supra* ¶¶ 36–46, 50–51, 53–59; *see also* ¶ 70).

        b.     Moreover, individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

        c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of

an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

73. As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a. Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard

drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be

sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.     I also know that when an individual uses a digital device to commit a crime, such as communicating with co-conspirators to commit a crime, transferring sensitive Government documents to personal devices, or facilitating financial transfers, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

74.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.    Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the

absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In

addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

    e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile

device.

   f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

  75. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

   a. Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

    1. Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES.  The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert,

in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2.    The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.    In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## **CONCLUSION**

76.     I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and to seize the items described in Attachment B.


Respectfully submitted,


*Christopher D. Swenson*

Christopher D. Swenson
Special Agent
United States Department of State –
        Office of Inspector General



Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3)
on this 19th day of May, 2021


_____

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

72

## ATTACHMENT A

*Person to be searched*

1.      MAY SALEHI is a SUBJECT PERSON to be searched.   The SUBJECT

PERSON was born on or about September 9, 1955, and has an approximate height of 5'6" and

an approximate weight of 120 pounds.  The search of the SUBJECT PERSON includes any and

all clothing and personal belongings, backpacks, briefcases, purses, bags, and electronic devices

that are within SALEHI's immediate vicinity and control, wherever SALEHI is located within

the federal judicial district of the District of Columbia.  SALEHI is depicted in the following

photographs:

 

*Property to be searched*

2.      The property to be searched is the residence of SALEHI, located at 4227 Jenifer

St., N.W., Washington, D.C. 20015 ("PREMISES"), and electronic devices located therein.  The

PREMISES are further described as a two-story residence (house/duplex) with a basement.  The

PREMISES are located on the north side of Jenifer Street, N.W. and the address is identified as "4227" on the front of the house. The front porch of the house is enclosed with a screen and screen door. A picture of the exterior front of the PREMISES is attached below:



3.      Inside the screened in area, the numbers "4227" are located in black writing on a white background next to the front door, as depicted in the above and below photographs:



2

**ATTACHMENT B**

*Property to be seized*

1.      The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 18 of the United States Code, Sections 201 (bribery of public officials), 371 (conspiracy to defraud the United States), 666 (federal programs bribery), 1001 (false and fictitious statements), 1031 (major fraud against the United States), 1346 (honest services fraud), and 1956 (money laundering), and Title 31 of the United States Code, Section 5324 (structuring) (the "Subject Offenses"), as described in the search warrant affidavit, including, but not limited to:

*Physical Items*

a.      Any electronic devices, cell phones, and electronic storage media, including the following specific devices:

| date reg received | registration source | product description | part number | |
|---|---|---|---|---|
| 2013-11-13 18:02:36 | ios | IPHONE 4S WHITE 8GB CDMA-SPRIN | MF270LL/A | |
| 2015-11-27 19:33:38 | iCloud | MBP 13.3/2.5/2X2GB/500/SD-USA | MD101LL/A | |
| 2016-01-09 15:20:24 | iCloud | IPHONE 6 SILVER 16GB SPRINT-USA | MG6A2LL/A | |
| 2017-04-09 21:06:28 | iCloud | IPHONE 7 JET BLACK 128GB-USA | MN8Q2LL/A | |
| 2018-01-31 02:22:02 | iCloud | IPHONE 6S SPACE GRAY 32GB AT&T- | MN0M2LL/A | |
| 2018-11-25 01:58:15 | iCloud | IPHONE 6S SPACE GRAY 32GB AT&T- | MN0M2LL/A | |
| 2019-08-07 00:03:54 | iCloud | IPHONE 7 BLACK 32GB AT&T-USA | MN9D2LL/A | |
| 2020-06-18 11:55:02 | iCloud | IPHONE 7 BLACK 128GB-USA | MN8L2LL/A | |
| 2020-08-19 20:35:02 | iCloud | LOANER,IPHONE 7,MM,32GB | 661-08256 | |
| 2020-09-01 15:10:16 | iCloud | IPHONE 11 WHITE 64GB SPR-USA | MWK12LL/A | |

b.      All bank documents, records of investments, financial documents and ledgers, to include any ledgers that appear to be in a foreign language, requiring translation;

c.      All tax-related records and filings;

d.      Cash greater than $5,000 U.S. dollars;

3

e.  Any official State Department documents referencing State Department construction projects or referencing any disputes or litigation relating to those projects, or any documents whatsoever referencing Montage Construction company or agents of Montage, or sent by, to, or from any Montage employees or agents of Montage, or any documents referencing Sina Moayedi, or sent by, to, or from Sina Moayedi;

*Electronic Items to Search*:

f.  All electronic calendars, contacts, photos, Skype, Telegram, WhatsApp, and other programs used to communicate;

g.  All notes applications and emails;

h.   All SMS and/or other types of text messages;

i.  All State Department data or documents;

j.  All search histories and browser histories; and

k.  All iCloud and/or cellphone backups.

2.  For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

a.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious

4

software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

e.  evidence of the times the Device(s) was used;

f.  passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

g.  documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

h.  records of or information about Internet Protocol addresses used by the Device(s); and

i.  records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.  Routers, modems, and network equipment used to connect SALEHI's computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media

5

that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>3636 16TH STREET NW, SUITE AG-50,<br>WASHINGTON,D.C., AND ELECTRONIC DEVICES<br>THEREIN UNDER RULE 41 | )<br>)<br>)<br>)<br>)<br>)   Case No. 20-sw-214 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. sec. 371, 1001,<br>1028A, 1031, 1343, 1344,<br>1349, 1623, 1924, 1956 | Conspiracy to defraud U.S., false statements, aggravated identity theft, major<br>fraud against U.S., wire fraud, bank fraud, wire and bank fraud conspiracy,<br>perjury, unauthorized removal/retention of classified materials, money laundering |

The application is based on these facts:

See Attached Affidavit of Special Agent Christopher Swenson

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Dept. of State-OIG Special Agent Christopher Swenson
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 09/18/2020 _____

2020.09.18 18:38:25 -04'00'
*Judge's signature*

City and state: Washington, D.C. _____

Robin M. Meriweather, United States Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No.  20-sw-214 |
| 3636 16TH STREET NW, SUITE AG-50, | ) |
| WASHINGTON, D.C., AND ELECTRONIC DEVICES | ) |
| THEREIN UNDER RULE 41 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia _____
*(identify the person or describe the property to be searched and give its location)*:

    See Attachment A hereto

        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    See Attachment B hereto

        **YOU ARE COMMANDED** to execute this warrant on or before _____ October 2, 2020 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
*(United States Magistrate Judge)*

        ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
        ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   09/18/2020                                        2020.09.18
                                                                          18:39:00 -04'00'
                                                                       *Judge's signature*

City and state:      Washington, D.C.                       Robin M. Meriweather, United States Magistrate Judge
                                                                     *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 20-sw-214 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

1.      The property to be searched is Montage Inc.'s ("MONTAGE") corporate offices located at Suite AG-50 at 3636 16th Street NW, in Washington, D.C. ("PREMISES"), and electronic devices therein.   The PREMISES are further described as being housed in a large multi-story mixed use residential and commercial building with a U-shaped driveway and a covered entrance that opens into a lobby with a security desk.  A picture of the exterior of the PREMISES building is below:



2.      The PREMISES are located on the first floor, in Suite AG-50 of the above building.  The PREMISES are accessed by entering through the main doors, passing the security desk, and taking the corridor on the first floor to the left.   A picture of the exterior of MONTAGE's business entry-space at Suite AG-50 is located below:



3.      The PREMISES are accessed through a dark-framed door with a large glass panel.  The words "ECKANKAR Reading Room" are printed on the glass in blue.  Above the door there appears to be a camera or other security system apparatus.  To the right of the door is a sign that says "AG-50."

# ATTACHMENT B

*Property to be seized*

1.      The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 18 of the United States Code, Sections 371 (conspiracy to defraud the United States), 1001 (false and fictitious statements), 1028A (aggravated identity theft), 1031 (major fraud against the United States); 1343 (wire fraud), 1344 (bank fraud), 1349 (conspiracy to commit wire and bank fraud), 1623 (perjury and false declarations before a court), 1924 (unauthorized removal and retention of classified materials), and 1956 (money laundering) (the "Subject Offenses"), as described in the search warrant affidavit, including, but not limited to:

      a.   Records and information relating to forged submittals for the Guayaquil Consulate Project in Ecuador, and other State Department or other Government construction projects;

      b.   Records and information relating to the use of Dropbox or other commercial internet transmittal services to transmit sensitive and/or classified materials;

      c.   Records and information relating to forged or fraudulent construction documents, including forged "As-Built" drawings for the Guayaquil Consulate Project in Ecuador;

      d.   Records and information relating to forged or fraudulent business licenses;

      e.   Records and information relating to falsified employee qualifications for MONTAGE personnel working, or proposed for work on, State Department constructions projects;

f.   Records and information relating to identity theft of third parties in connection with the submission of employee qualifications for construction projects;

g.   Records or information relating to the ownership and corporate structure of MONTAGE;

h.   Records and information that constitute evidence of use, control, ownership, or occupancy of the PREMISES and things therein;

i.   Records and information that constitute evidence of the state of mind of MONTAGE, MOAYEDI, and/or MONTAGE's employees, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

j.   Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with MOAYEDI or other MONTAGE employees about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

2.   Digital devices used in the commission of, or to facilitate, the above described offenses, including devices used to create, or to electronically submit, forged construction plans to the State Department; devices used to transfer sensitive and potentially classified information electronically through unauthorized cloud computing systems or the internet, devices used to create or electronically submit forged final drawings to the State Department; and devices used

2

to commit identity theft by misappropriating the resume of a third party and/or electronically editing the resume.

3.    For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

    a.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

    b.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

    d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

    e.  evidence of the times the Device(s) was used;

    f.  passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

g.  documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

h.  records of or information about Internet Protocol addresses used by the Device(s);

i.  records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.      Routers, modems, and network equipment used to connect MONTAGE computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data

4

(excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF:

3636 16TH STREET NW, SUITE AG-50
WASHINGTON, D.C., AND
ELECTRONIC DEVICES THEREIN                SW No. _____20-SW-214_____

UNDER RULE 41

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Christopher D. Swenson, Special Agent of the U.S. Department of State ("State

Department"), Office of the Inspector General ("OIG"), being first duly sworn, hereby depose

and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 3636 16th Street

NW, Suite AG-50, Washington, D.C., hereinafter "PREMISES," further described in

Attachment A, for the things described in Attachment B.

2.      I have been employed as a Special Agent with the State Department for over

seven years.  During that time, I have conducted complex, multinational investigations and have

made arrests for complex financial crimes involving money laundering, identity theft, wire fraud,

visa fraud, and bank fraud.  Based on my training and experience, I am familiar with the use of

electronically stored information in such investigations.  During my career, I have participated in

the execution of numerous search warrants involving documentary and electronic evidence.  I

have received numerous certifications in computer and mobile device forensics, attended training in white collar fraud, and completed approximately 27 weeks of New Agent Training at the Federal Law Enforcement Training Center in Brunswick, Georgia, and the Diplomatic Security Training Center in Dunn Loring, Virginia.

3.       Prior to my employment with the State Department, I was a sworn officer with Homeland Security Investigations, and served as a police detective and supervisor with the City of Newburgh, New York, police department, where I was assigned to investigate homicides, robberies, and gang conspiracy cases.  I have a total of approximately 20 years of law enforcement experience and have made over approximately 700 arrests.  As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

4.       The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.       Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18 of the United States Code, Sections 371 (conspiracy to defraud the United States), 1001 (false and fictitious statements), 1028A (aggravated identity theft), 1031 (major fraud against the United States), 1343 (wire fraud), 1344 (bank fraud), 1349 (conspiracy to commit wire and bank fraud), 1623 (perjury and false declarations before a court), 1924 (unauthorized removal and retention of classified materials) and 1956 (money laundering) (the "Subject Offenses"), have been

committed by MONTAGE, INC. (a construction company), Sina MOAYEDI (the owner of MONTAGE), and other co-conspirators.

6.     Among other things, MONTAGE, MOAYEDI, and/or its principals and agents have (a) lied that MONTAGE is a female-owned small business; (b) lied that its employees have the qualifications necessary to complete the construction projects, such as a fake engineering degree; (c) repeatedly forged an architect's signature and forged a Washington D.C. business license; (d) supplied the resume of an individual who did not work for MONTAGE in order to secure a contract; (e) allowed foreign nationals—who did not have a security clearance—unfettered access to classified building plans, including plans for an FBI facility; and (f) uploaded sensitive project plans and drawings to the internet, via the commercial application known as DropBox.  In so doing, MONTAGE, MOAYEDI, and MONTAGE's employees have defrauded the U.S. Government, harmed MONTAGE's competitors, jeopardized national security, and jeopardized physical security—as certain structures built by MONTAGE, including some that currently house U.S. military members and diplomats, may not be structurally secure. Thus, there is probable cause to search the PREMISES, which are MONTAGE's corporate headquarters, further described in Attachment A, for the things described in Attachment B.

## PROBABLE CAUSE

7.     Since in or around June 2018, I have been investigating government contract fraud and associated misconduct related to MONTAGE, INC.  MONTAGE is a U.S.–based business incorporated in 1986, which is primarily involved in worldwide Government construction projects, including embassies, military posts, consulates, and similar overseas properties owned and operated by the United States Government.  MONTAGE has performed

3

over $220 million dollars in contracting work for the U.S. Government, including for the Department of Defense, the Department of Justice, the State Department, the Federal Bureau of Investigation, the Department of the Interior, the Department of Agriculture, NASA, the EEOC, and the Department of Veterans Affairs.

8.      Since 2014, MONTAGE appears to have focused primarily on competing for and obtaining contracts with the State Department.  During that period, the State Department has awarded MONTAGE approximately six U.S. Embassy/Consulate construction project contracts totaling $100 million in locales such as Ecuador, Spain, Sudan, the Czech Republic, and Bermuda.[1]

9.      MOAYEDI purports to be the Vice President of MONTAGE, but based on the information provided further below, I submit that there is probable cause to believe that MOAYEDI is actually the true and beneficial owner of MONTAGE, that MOAYEDI is the controlling entity behind MONTAGE, and that MOAYEDI makes all material decisions on MONTAGE's behalf.

10.     MONTAGE operates out of two corporate headquarters in the Washington, D.C. area.  The first location is the PREMISES.  The PREMISES is the only location that MONTAGE lists as its corporate headquarters, and holds out to the public as its primary business location. However, as discussed herein, MONTAGE also operates a second "hidden" location at 4601 N. Park Ave Suite 101C, Chevy Chase, Maryland ("LOCATION-1"), which is unknown to the public, and where MONTAGE's employees work on a daily basis.  As discussed herein, I submit

---

[1] A review of bank records shows that MONTAGE routed several hundred wire transfer payments through the Southern District of New York to support its business operations abroad.

4

that there is probable cause to believe that evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES will be found at both the PREMISES and LOCATION-1.[2]

### Background on the GUAYAQUIL PROJECT

11.     Based on my training, experience, and involvement in this investigation, including my review of various documents and records and my participation in various interviews, I am aware of the following, among other things:

a.     On or about September 30, 2014, the State Department awarded a contract to rehabilitate certain existing buildings and to construct a new Marine Security Guard residence ("MSGR")[3] at the United States Consulate in Guayaquil, Ecuador ("the GUAYAQUIL PROJECT"). The value of the GUAYAQUIL PROJECT was approximately $17 million and was awarded as a design-build contract to MONTAGE.

b.     A "design-build contract" is a type of contract solicitation in which the award combines both the architecture and construction services into one contract. With regard to State Department projects, a firm that is awarded a design-build contract is obligated to both design and construct the structure utilizing the current best practices of the profession, as well as by relying upon specific standards delineated by the State Department's Overseas Building

_____

[2] Accordingly, the Government is also seeking a warrant for LOCATION-1, in an application it will be presenting to the United States District Court for the District of Maryland.

[3] U.S. Marine Corps detachments are responsible for providing worldwide security at American embassies, American consulates, and other official United States Government overseas offices such as NATO.

Operations division ("OBO").  These standards are referenced and incorporated by reference into the contract.

        c.     One such standard incorporated into State Department projects is the designation of a Designer-of-Record (the "DOR").  The DOR is the head of the architectural/engineering ("A/E") team and is solely vested with the authority to draft and submit architectural drawings or make structural or engineering changes on a given project.[4]

        d.     The A/E subcontractor that is performing work on the GUAYAQUIL PROJECT is "BCG," an architecture firm based in Buenos Aires, Argentina.  Two individuals working for BCG, "ARCHITECT-1" and "ARCHITECT-2," are the lead architects assigned to the GUAYAQUIL PROJECT as the DOR.

        e.     The State Department's OBO division requires contractors to submit all planning, design, and architectural documents, called "submittals," via a sensitive but unclassified computer system called "Projnet."[5]  Projnet is a system accessible only by registered users who have completed training in its use.  Users are required to have their own credentials to access the system, which include the users' e-mail address and password as unique attributes.

---

[4] It is common for the firm awarded the winning bid to employ various specialty subcontractors, including architects and engineering firms, to perform some or all of the functions required under the design-build contract.

[5] Generally, submittals are drawings, architectural planning proposals, and materials specifications relating to how certain aspects of a facility should be designed and built.  Thus, for example, a submittal may contain the design for a structure's fire control system, or it may contain the proposed design for a certain portion of the building's electrical service.

f.      Projnet allows there to be a permanent record of submittals that were approved, rejected, revised, and/or reviewed by pertinent personnel from OBO or the contractor. Projnet also provides email notification to users that are authorized access on a project, notifying them of actions that have been taken, or confirming that documents have been uploaded.

### Forged Submittals to the Government and Aggravated Identity Theft

12.      Based on my discussions with officials at the State Department, interviews of witnesses, conversations with other agents, and my review of documents and materials related to this case, I know that on or about October 30, 2016, the OBO Project Director for the GUAYAQUIL PROJECT ("OBO DIRECTOR-1") identified anomalies in certain A/E documents uploaded via Projnet by MONTAGE personnel that purported to be signed by the DOR (the "Forged Submittals").  Among the anomalies discovered were certain submittals that did not appear to have come from the DOR.  The State Department notified MOAYEDI regarding these anomalies in Fall 2016.  In response, MOAYEDI sent the State Department contracting officer a letter, dated November 7, 2016, in which MOAYEDI stated, among other things, that (1) the submittals in question were for "previously approved submittals," (2) any fraudulent submittals were the result of an unnamed employee acting "mindlessly" and due to previous experience with another employer, and (3) (as discussed further below) MOAYEDI and MONTAGE were unaware of any unauthorized use of commercially available services such as Dropbox.[6]

---

[6] As discussed herein, my investigation later demonstrated that these statements were false.  For example, further review of the submittals referenced in the November 2016 MONTAGE letter sent by MOAYEDI show that numerous submittals were in fact, new submittals, and were not previously approved by anyone, as alleged by MOAYEDI in the letter.

13.     After I began investigating this matter in 2018, I contacted ARCHITECT-1 for clarification, after which I discovered that BCG and the A/E team had no record of such submittals being received, signed, or otherwise approved, contrary to MOAYEDI's representation.

14.     On or about July 25, 2018, I traveled to Argentina to personally interview ARCHITECT-1.  ARCHITECT-1 stated that he had never given authorization for any other individual to affix his signature, utilize his signature and/or architectural stamp, and had not authorized any others to use his means of identification for any purpose.

15.     Furthermore, ARCHITECTS-1 and -2 provided me with a complete set of GUAYAQUIL PROJECT documents that they authenticated (the "Project Document Set"). ARCHITECTS-1 and -2 further informed me that any document other than what was contained in the Project Document Set they had provided would not be a legitimate project document, because it had not been signed by the DOR nor submitted to the State Department.  I also learned from ARCHITECTS-1 and -2 that their firm was never contracted to, nor were they intending to, deliver final drawings on the project, known as "as-builts."[7]

16.     After meeting with the DOR in Argentina, I and other State Department officials reviewed the Project Document Set that they had provided.  By comparing the universe of the

---

[7] Referred to as "as-builts," the final drawings of a project are generally produced after the fact, and are required to contain accurate renditions of all the design and construction that was performed on a particular project.  As-built drawings are vital to the on-going operation and maintenance of a facility, because they show the Government, among other things, where essential heating, ventilating and air conditioning systems are located, or where electrical utility components or fiber optic systems are located, for example.

Project Document Set with the full set of submittals that the State Department had previously received via Projnet, I and other State Department officials determined that the State Department was provided with numerous additional submittals involving life safety and structural issues that purported to be signed by the DOR, but were actually forged documents—documents that were not included in the Project Document Set provided by the DOR.

17.     In short, I and other agents investigating this case have identified an approximate six-month period in 2016 during which multiple engineering and construction design submittals relating to the GUAYAQUIL PROJECT were alleged to have been approved by the DOR and submitted to the State Department.  But in actuality, the submittals were forgeries, because BCG informed us that they had neither reviewed nor approved any of them, and—being unaware of the submittals—BCG had never verified that any of the specified fieldwork in the submittals had been performed at the Consulate. Many of these submittals included material changes to the original design of the structure.  The following non-exhaustive list contains several examples:

    a.  A submittal concerning fire extinguishers and fire protection was determined to have been uploaded to Projnet by MOAYEDI on or about September 23, 2016, and contained a forged DOR signature.

    b.  A submittal concerning structural steel drawings was determined to have been uploaded to Projnet by MOAYEDI on or about September 29, 2016, and contained a forged DOR signature.

    c.  A forged submittal concerning concrete materials was signed by GUAYAQUIL PROJECT manager, Thad Quarles, and uploaded to Projnet by an employee of MONTAGE on April 27, 2015.  Among other things, in this instance, a genuine prior submittal was modified and resubmitted as a forgery purporting to be for "concrete mix design."

    d.  A submittal concerning fire resistant glazing was uploaded to Projnet by MOAYEDI on or about August 15, 2016, and contained a forged DOR signature.

e.  A submittal concerning roof design was uploaded by MOAYEDI on or about November 23, 2016, and was signed by an individual other than the designated DOR.[8]

18.     None of these submittals were authorized, because none were approved by the DOR.  Moreover, MONTAGE continued to receive payments for the work it performed, because the State Department was unaware that MONTAGE was generating forged submittals.

**The Use of Dropbox and the Internet for Classified or Sensitive Department Records**

19.     Based on my discussions with officials at the State Department, interviews with witnesses, conversations with other agents, and my review of documents and materials related to this case, I also know that MONTAGE officials frequently instructed the DOR to use a commercially available electronic storage and file transfer service called "Dropbox" or "Dropbox.com" to transfer submittals, which is strictly prohibited.

20.     Information regarding the construction and operation of overseas United States government properties is either classified, or sensitive but unclassified ("SBU") information. Even information that is only designated "SBU" is subject to strict controls over its dissemination because it may reveal, among other things, critical infrastructure, building vulnerabilities, points of ingress and egress, or sensitive law-enforcement data.  For this reason, State Department contractors working in overseas environments are contractually required to

---

[8] Other anomalies on other submittals not specifically outlined here include additional signatures of individuals signing as the DOR who were not authorized to do so, submittals missing signatures of the DOR, and additional submittals using a fraudulently employed "digitized" signature of the DOR.

share project documentation on the Projnet system only, as opposed to sharing such information on publicly available share systems such as Dropbox.com.[9]

21.     Despite these contractual requirements, while meeting with ARCHITECT-1 in Buenos Aries, ARCHITECT-1 provided me with an email from MONTAGE project manager Thad QUARLES, dated January 20, 2015, in which QUARLES instructed ARCHITECT-1 to use Dropbox.  The email, which was sent from the email address tquarles@MONTAGEinc.com, stated in substance and in part, "I will be sending you a drop box link that contains folders for the submittals per division. Each time we make a submission in this folder we will send you an email locating the file that you need to open for review. We will keep an updated submittal log as well."   Also included on the above correspondence was MOAYEDI (utilizing email sinam@MONTAGEinc.com) and MONTAGE employee Marianela Lugo (utilizing email pm11@MONTAGEinc.com).  MOAYEDI was cc'ed on this email, which predated by more than a year the letter that MOAYEDI wrote the State Department in November 2016, in which he claimed that he and MONTAGE were "unaware of any unauthorized use of Dropbox…"

22.     Moreover, in the course of my investigation, other individuals with knowledge confirmed that MOAYEDI and MONTAGE had ordered the use of Dropbox for communications relating to the GUAYAQUIL PROJECT, in direct contravention of the Project contract, and thereby placing at risk SBU materials relating to the design and construction of the Project.  For example:

---

[9] Sharing SBU information on commercially available services such as Dropbox exposes that information to the risks of theft, hacking, and exploitation by foreign intelligence agencies, among other things.

a.      On or about November 13, 2018, I interviewed a former MONTAGE employee ("FORMER EMPLOYEE-1").   FORMER EMPLOYEE-1 was employed by MONTAGE during approximately 2014 and 2015.   FORMER EMPLOYEE-1 stated that MONTAGE utilized the commercial cloud-based storage service Dropbox for the storage of sensitive and possibly classified material.   Moreover, FORMER EMPLOYEE-1 stated that she directly expressed concern to MOAYEDI about Dropbox and its use, and MOAYEDI told her not to tell anyone that MONTAGE used the service.

b.      Similarly, in or about April 2019, I interviewed another former employee of MONTAGE ("FORMER EMPLOYEE-2").   FORMER EMPLOYEE-2 was employed by MONTAGE from approximately 2016 to 2019. FORMER EMPLOYEE-2 confirmed that MONTAGE employees frequently emailed classified information amongst each other on the internet and via unclassified means.   MONTAGE also had a practice of transferring classified material via the unsecure Dropbox.com service on the internet.   FORMER EMPLOYEE-2 believes that MONTAGE stored all of the data from *every* project within its account on Dropbox.com.

## MONTAGE Forged the As-Built Drawings for the GUAYAQUIL PROJECT

23.     On or about August 12, 2018, I traveled to Guayaquil, Ecuador, and interviewed OBO DIRECTOR-1.   As mentioned, OBO DIRECTOR-1 served as the representative of OBO on site at the GUAYAQUIL PROJECT.   He also served as the Contracting Officer's Representative ("COR") during his tenure.

24.     Among other things, OBO DIRECTOR-1 stated that when evaluating whether to approve a submittal in his capacity as Project Director and COR, he relies on the information

12

submitted to be true and accurate.  He further stated that when certifying contractor payment requests, he relies on the fact that such requests accurately represent work completed as per the terms of the contract.  OBO DIRECTOR-1 further discussed with me the importance to a project of accurate drawings.  For example, he referenced the Kansas City Hyatt disaster as one of the results that can occur from inadequate reviews, improper design changes, or a lack of communication between the engineer and the build team.[10]  As such, OBO DIRECTOR-1's expectation was that properly certified as-built drawings would be maintained during the life of the GUAYAQUIL PROJECT, and that final as-built drawings would be submitted at the conclusion of the project.

25.     From my review of Projnet and my conversations with witnesses, I know that on or about August 29, 2018, a set of "final" as-built drawings were uploaded via the internet to Projnet by a MONTAGE employee ("FORMER EMPLOYEE-5") who was the then-project manager for MONTAGE at the Guayaquil Project (the "As-Built Drawings").  These architectural drawings, like other drawings, and the aforementioned submittals in design/build contracts, are required to be certified by the DOR.

26.     I examined the As-Built Drawings and observed the signature, and architectural stamp and logo of the DOR and their company, BCG.  But in an email communication with BCG on or about September 21, 2018, I confirmed that the As-Built Drawings were never reviewed or signed by BCG.  BCG further represented to me that they were never asked to provide as-built

---

[10] The referenced incident is the 1981 Hyatt Walkway Collapse, in which 114 people were killed and over 200 injured due to a complete structural failure of two walkways situated directly on top of one another in Kansas City, Missouri.

drawings for the GUAYAQUIL PROJECT, and moreover, BCG would never have provided as-built drawings without verifying their accuracy through a field inspection—which they did not do.  BCG further informed me that if I was in possession of documents purporting to be As-Built Drawings for GUAYAQUIL, I could be assured that they were never reviewed or approved by the DOR.

27.     I further reviewed MONTAGE's payment forms, called "Application and Certifications for Payment."  These requests for payment are submitted electronically via email, and are necessary in initiating payments from the State Department to a contractor.  These forms further include the certification that: "The undersigned contractor certifies that to the best of the Contractor's knowledge information and belief the work covered by this application for payment has been completed in accordance with the contract documents…"

28.     Moreover, the GUAYAQUIL PROJECT payment certifications contain additional verbiage attesting that as-built drawings were being maintained as the project was being constructed, and were maintained as current.  A further review of these payment certifications for the GUAYAQUIL PROJECT showed that MOAYEDI had certified invoices in 2015, 2016, 2017 and 2018, stating that MONTAGE was in full compliance with the terms of the contract, causing nearly $17,000,000 to be paid to MONTAGE by the United States Government.  Moreover, MONTAGE personnel have continued to submit official documents certifying that they have complied with the terms of the contract, including as recently as July 2020.

29.     I was further informed by BCG that on or September 20, 2018, BCG received an email from FORMER EMPLOYEE-5 (who was then a MONTAGE project manager) asking for "final acceptance" of a set of nine computer assisted design drawings relating to "seismic

14

bracing," to be included in the final seismic package requested by OBO.[11]   Upon review, BCG reported to me that these drawings had been the subject of unauthorized modification by MONTAGE, by adding the words "AS-BUILT" and keeping ARCHITECT-1's stamp and signature on them.   These documents appeared to have been fabricated by MONTAGE and purported to reflect the GUAYAQUIL PROJECT's as-built conditions.   But ARCHITECT-1 reported that because BCG had not conducted an inspection of this aspect of the project's construction, BCG could not warrant that the drawings were accurate, or that the specified components in the building were in fact installed correctly, or that they would withstand a seismic event, thereby jeopardizing the safety at GUAYAQUIL.

30.     In short, based on the information provided by BCG, and on my conversations with OBO DIRECTOR-1 and other witnesses, it is clear that MONTAGE forged the DOR's signature on the As-Built Drawings, and falsely certified that it had properly maintained and prepared the As-Built Drawings, when it had not.   As a consequence, the United States Government is now the owner of a $17 million construction project in Ecuador for which it has no reliable architectural drawings that it can reference when performing future maintenance, repairs, or renovations.   In addition, the facility may be potentially compromised in the event of an earthquake or other seismic event.

---

[11] Generally, seismic bracing systems are designed and engineered to secure suspended non-structural equipment such as HVAC ducts, or electrical or plumbing components, within a building to minimize damage from an earthquake or seismic event.

**MONTAGE Falsified The Qualifications of Contractually Required Personnel**

31.     State Department construction contracts also typically contain mandatory requirements concerning the requisite skills, training, and job experiences regarding the principal individuals employed by the firm awarded the contract.  Based on my discussions with officials at the State Department, interviews with witnesses, conversations with other agents, and my review of documents and materials relating to this case, I also know that MONTAGE also violated its contracts by intentionally deceiving the State Department regarding the qualifications of many of its key individuals employed on State Department projects.

32.     For example, on or about October 2, 2018, I interviewed a former employee of MONTAGE that served as an office assistant to MOAYEDI ("FORMER EMPLOYEE-3"). FORMER EMPLOYEE-3 was employed by MONTAGE during approximately 2014 to 2016. During FORMER EMPLOYEE-3's employment, MOAYEDI had directed FORMER EMPLOYEE-3 to engage in such activities as counterfeiting a Washington, D.C. business license, and misrepresenting the dollar value of projects completed in bid submissions to the United States Government.  FORMER EMPLOYEE-3 also stated that MONTAGE kept a "bank" of resumes it used to fill contractual requirements that belonged to individuals who had never worked at MONTAGE during the claimed period, if at all.  FORMER EMPLOYEE-3 further informed me that, while at MONTAGE, she was instructed to modify certain submittals by changing their submission numbers.

33.     Likewise, on or about October 3, 2018, I interviewed another former employee of MONTAGE ("FORMER EMPLOYEE-4").   FORMER EMPLOYEE-4 was employed by MONTAGE during a period of approximately 2014 to 2015.  FORMER EMPLOYEE-4 stated

16

that MOAYEDI conspired with him to falsely claim that he met United States Government contractual requirements by fraudulently claiming that he had worked for MONTAGE for a longer period of time than was true and by delineating responsibilities that FORMER EMPLOYEE-4 never had. MOAYEDI informed FORMER EMPLOYEE-4 that this was to meet State Department and contractual requirements governing minimum experience in certain key positions.

34.     Based on information derived from the above witness interviews, I then reviewed resumes submitted by MONTAGE for various State Department projects. Department requirements referenced in the contract specify certain levels of experience in order to serve as "key personnel" (*i.e.*, personnel whom the State Department has deemed critical to the safe, successful, and timely completion of a project). For example, a typical State Department contract requires that the Project Manager have a minimum five years of professional employment as an engineer or architect managing comparable work, as well as a bachelor's degree in architecture or engineering.

35.     In the course of my review, I identified numerous deficiencies regarding the resumes of key personnel submitted to the State Department for the GUAYAQUIL PROJECT. To state just three of the many examples that I found:

a.     MONTAGE submitted an individual for the key role of Project Controls Engineer and Site Health Project Manager. In the claimed experience for this individual, it stated that he was employed at MONTAGE since 2008 and had "inspected emergency egress and life/safety issues" and conducted "inspections of asbestos containment." In fact, this individual

had only been employed at MONTAGE for approximately one year, and served in an office staff capacity, performing none of those duties.

b.      Similarly, the aforementioned Thad QUARLES was submitted for the key role of Project Manager. As per the contractual requirements, QUARLES' experience and work history were laid out in a resume (the "QUARLES Resume"). The QUARLES Resume stated that he had earned a bachelor's Degree in Civil Engineering from Southern Polytechnic University. However, I reviewed sworn testimony from a 2019 civil deposition in which QUARLES stated that he attended Southern Polytechnic for only two years and does not possess an engineering degree. The QUARLES Resume also claimed years of full-time complex work in the construction field in various capacities over several years. I cross-referenced this claimed work experience with QUARLES' SF-86 security clearance paperwork and found that QUARLES had actually sold meat as a door-to-door salesman, was a landscaper, and built swimming pools for several years during the same time period.

c.      I also reviewed MOAYEDI's resume, which had been submitted to the State Department as part of the quality control plan for a $15 Million project awarded to MONTAGE in 2016 for compound security upgrades at the United States Embassy in Madrid, Spain (the "MOAYEDI Resume"). The MOAYEDI Resume claimed that MOAYEDI had earned a master's degree in Architecture from The Catholic University of America in 1982. But I cross-referenced this claimed experience with MOAYEDI's SF-86 security clearance paperwork, and found that MOAYEDI had not actually earned this degree until 2014.

36.      From my investigation, there is probable cause to believe that the above examples are only illustrative of numerous misrepresentations MONTAGE has made to the U.S.

Government as part of efforts to secure contracts from the Government. I discovered multiple examples, across multiple projects for which MONTAGE was the winning bidder, in which MONTAGE presented false qualifications for key individuals to the United States Government. For example, in addition to the GUAYAQUIL PROJECT, I discovered, among other things, that MONTAGE had deprived the United States Government of the services of qualified individuals in a $20 million project awarded to MONTAGE in 2016 for compound security upgrades at the U.S. Embassy in Prague, Czech Republic, and a $16 Million project awarded to MONTAGE in 2017 for the Marine Security Guard Residence at the U.S. Embassy in Khartoum, Sudan.

### The Identity Theft of VICTIM-1

37.     In the course of my investigation I also observed that the name of a particular individual ("VICTIM-1"), and her accompanying biographical and resume information, had been submitted by MONTAGE to the State Department as a qualified key personnel on numerous occasions. I reviewed the SF-86 security clearance paperwork for VICTIM-1 and noted no record of VICTIM-1 having worked for MONTAGE. Additionally, a review of MONTAGE's "QuickBooks" payroll records showed no instance of VICTIM-1 having been paid by MONTAGE.

38.     On or about December 13, 2018, I interviewed the true VICTIM-1 that was the subject of these submissions. VICTIM-1 confirmed to me that she was unfamiliar with MONTAGE, had never worked for MONTAGE, and had never authorized any individuals to submit her resume in support of any project.[12] Additionally, VICTIM-1 authenticated certain

---

[12] VICTIM-1 is unsure how MONTAGE obtained her resume. However, she notes that she worked for a rival construction company, where one of her co-workers abruptly resigned and

portions of her resume that had been submitted by MONTAGE to the State Department, but noted that there were numerous insertions and fraudulent misrepresentations as to her depth and breadth of experience, including the assertion that she had worked for MONTAGE for several years.

39.    I also located an example of VICTIM-1's identifying information and resume when it had been submitted by MONTAGE in 2014 in support of the contract bid package for the GUAYAQUIL PROJECT.    Among the numerous false assertions that MONTAGE made concerning VICTIM-1 with regard to the Guayaquil Project were that:

a.    VICTIM-1 had been employed by MONTAGE as a Quality Control Manager since 2009, working on several MONTAGE projects, including classified and Department of Defense projects;

b.    VICTIM-1 would be the Quality Control Manager should MONTAGE win the GUAYAQUIL PROJECT bid, and would report directly to Sina MOAYEDI; and

c.    VICTIM-1 was "currently committed" to a MONTAGE project in Idaho involving the construction of an FBI building.

40.    I also reviewed the "audit trail" information in Projnet for the submission of VICTIM-1's resume and observed that Sina MOAYEDI had uploaded the document containing this information, along with submittal form stating "I certify the above items have been reviewed in detail and are in strict conformance with the contract drawings and specifications except as otherwise stated."  This form was also digitally signed by MOAYEDI.

---

went to work for MONTAGE—where he was assigned to the GUAYAQUIL PROJECT.  She believes that this co-worker may have stolen her resume and provided it to MONTAGE.

41.     I further located additional instances where VICTIM-1's resume was uploaded to Projnet as proposed "key personnel" for a project.  For example, in 2016, VICTIM-1's Resume was submitted for the key role of Quality Control Manager for the compound security upgrade project at the U.S. Embassy in Prague.  Once again the qualification statements associated with Victim-1 for this submission were false.  By reviewing the "audit trail" information in Projnet, I again observed that Sina MOAYEDI had uploaded the document containing this information, along with a signed certification that the information was accurate.

### MOAYEDI' s Ownership Fraud Regarding MONTAGE

42.     As has been discussed, MOAYEDI purports to be the Vice President of MONTAGE.  Based on my review of Maryland Secretary of State records for MONTAGE, I learned that MOAYEDI was listed as the President of the corporation from inception through on or about October 15, 2014.  The record then stated that on that date, MOAYEDI sold 51% of MONTAGE to Maria QUEVEDO.  This submission was signed by both MOAYEDI and QUEVEDO.

43.     However, my investigation revealed that, even *before* MOAYEDI allegedly sold 51% of the company to QUEVEDO, MOAYEDI claimed that MONTAGE was a female-owned business.  For example, a review of the GUAYAQUIL PROJECT bid package submitted to the State Department, dated on or about August 25, 2014, claimed several times that MONTAGE was a "woman-owned business," including listing this as the first qualification for the bid.  MOAYEDI digitally signed this submission, certifying that it was true—but it was not, because it pre-dated the October 2014 ownership sale reported to the Maryland Secretary of State.  Additionally, MONTAGE again claimed in a bid package submitted in support of a Copenhagen,

21

Denmark project dated September 9, 2014, that MONTAGE was a "woman-owned business." This again was false, because it predated the October 2014 ownership transfer.

44.   Elsewhere, MOAYEDI's statements cast doubt on the claim that MONTAGE is a woman-owned business.  For example, MONTAGE applied to renew a line of credit with United Bank in 2016.  While conducting routine due diligence, a commerical lender at United Bank emailed MOAYEDI at sinam@MONTAGEinc.com, stating: "Hi Sina, I was preparing/collecting documentation for the renewal of MONTAGE line of credit and came across the attached filing from Maryland State website…that Maria Lugo owns 51% of MONTAGE.  However, the company's 2014 Tax return form 1125E indicates you are 100% owner. Can you please clarify and provide us with the ownership structure of the company?"

45.    In his response, dated August 1, 2016, MOAYEDI stated in relevant part:  "I am the sole owner and President of MONTAGE and have always been. The document you have sent is an error and we are going to correct it this week. Maria is a family friend and like my daughter and I had considered at one point to have her follow in my footsteps but we never proceeded with this. We will go to Baltimore and make the correction this week."

46.   According to Maryland Secretary of State records, two days later, on August 3, 2016, MONTAGE filed a corporate amendment stating: "Maria Quevedo Lugo sold the 51 % of the shares of MONTAGE, Inc. to Sina MOAYEDI."  This document was not signed by Quevedo, and was signed only by MOAYEDI.

47.   But despite his representations to United Bank, and to the Maryland Secretary of State, MOAYEDI has a long history of continuing to claim that QUEVEDO was the president

and majority owner of MONTAGE, even after 2016.[13]  For example, I reviewed the historical System for Award Management ("SAM") website run by the U.S. Government General Services Administration (GSA). Registration in the SAM database is required for companies wishing to compete for Government Contracts, and SAM collects a variety of information provided by companies in order to properly classify the socio-economic status of a company.  My review found that MONTAGE registered as a minority owned, woman owned, Hispanic-American business in 2013, 2014, 2015, 2016, 2017, 2018, and 2019.  In 2013, Maria Lugo QUEVEDO was listed as the owner, but no title for her was listed.  From 2014-2019, Maria Lugo QUEVEDO was listed as the owner and President of the company.  In 2020, MONTAGE no longer listed QUEVEDO as the owner of the company, and MOAYEDI was again listed as the owner and President of the company.

48.    And my review of MOAYEDI and QUEVEDO's SF-86 security clearance paperwork told yet another story.  For example:

a.    QUEVEDO claimed she only worked part-time at MONTAGE from 2008 through 2014 on nights and weekends, but is "still on the books full-time because it is her family business, but she only physically works part-time" as the HR administrator.

b.    QUEVEDO then claimed to have been "on-leave" from MONTAGE from December 2012 through 2013 because "there was no business."  QUEVEDO, in fact, claimed Washington, D.C. unemployment benefits in 2013 based on this break.

---

[13] There are certain advantages to being "certified" as a woman-owned business.  For example, women-owned businesses must be awarded 5% of a contract's total dollar value for many Government contracts.

c.      Moreover, on or about April 14, 2014, QUEVEDO stated in her SF-86 interview that she actually had had a full-time position at a competing construction company, CONSTRUCTION COMPANY-1 since January 2014.   She further admitted that CONSTRUCTION COMPANY-1 "was unaware she has a clearance and works for MONTAGE, and she doesn't want them to know and there is no need to inform them because she doesn't need a clearance to work at [CONSTRUCTION COMPANY-1]."

d.      And, in *his* security clearance paperwork in 2016, MOAYEDI claimed to be the Vice President of MONTAGE.   For example, during a September 28, 2016, interview, MOAYEDI stated that he was the President from 2009-2011 but then Maria QUEVEDO purchased the majority of the company in 2012 and is "now the President of the company."   This statement directly conflicted with the statement MOAYEDI had signed and filed with the Maryland Secretary of State, in which he told the state that QUEVEDO had sold 51% of MONTAGE back to him.

49.     MOAYEDI and QUEVEDO have made a variety of further conflicting statements regarding who controls MONTAGE, including signed statements and statements under oath.   To take one example, in a sworn civil deposition taken on or about November 13, 2019, MOAYEDI contradicted himself again, claiming that QUEVEDO had been the president of MONTAGE "ever since" 2002.

50.     As described herein, I believe that MOAYEDI was and always has been the owner and principal of MONTAGE, and that QUEVEDO serves as his alter ego/nominee for the purposes of conferring minority and woman-owned business status on MONTAGE, which would afford MONTAGE benefits when seeking contracts with the State Department.   I base this

conclusion, in part, on the fact that, as described herein, MOAYEDI controls the day to day operations of the company, and has directed others to commit many of the Subject Offenses that are outlined herein.  Moreover, QUEVEDO has been described as "a family friend," appears to have no role in the day-to-day operation of the company, and in fact, at various times, has claimed to be unemployed, or has worked for another construction company.

### The PREMISES Search

51.    As stated, the PREMISES are one of two MONTAGE corporate office locations in the greater Washington, D.C. area.  Located at Suite AG-50 at 3636 16th Street NW, in Washington, D.C., MONTAGE's headquarters is a large multi-story mixed use residential and commercial building with a U-shaped driveway and a covered entrance that opens into a lobby with a security desk.  A picture of the exterior of the PREMISES is below:



52.    MONTAGE's offices are located on the first floor, in Suite AG-50 of the above building.  The PREMISES are accessed by entering through the main doors, passing the security

25

desk, and taking the corridor on the first floor to the left.   A picture of the exterior of MONTAGE's business entry-space at Suite AG-50 is located below:



53.     MONTAGE's entrance way is accessed through a dark-framed door with a large glass panel.  The words "ECKANKAR Reading Room" are printed on the glass in blue.  Above the door there appears to be a camera or other security system apparatus.  To the right of the door, about five feet from the floor, is a sign that says "AG-50."

54.     Based on my investigation, I submit that multiple factors demonstrate that the door is purposely mislabeled, and the above photograph does in fact denote the entrance to MONTAGE's Washington, D.C. corporate offices:

a.          First, a check of MONTAGE's public website (www.montageinc.com), conducted on September 16, 2020, shows that MONATGE reports that it "is a Woman Owned firm based in Washington, D.C."  Under the "contact" section of the webpage, MONTAGE lists

the PREMSIES as its business address.  Moreover, MONTAGE lists its phone number as 202-332-0186, which resolves to the address at the PREMISES when cross-referenced with telephone utility records.  And, MONTAGE has informed the Government that the PREMISES is both MONTAGE's physical address, and mailing address, through their registration with the government's General Services Administration ("GSA") System for Award Management ("SAM") contracting system.

b.        Second, a review of the Eckankar website, on September 10, 2020, shows that there are three "Eckankar Reading Rooms" situated across the country, and none of these three are located at the PREMISES.

c.        Third, according to the most recent bank statements I have reviewed, from February 2020, MONTAGE pays the rent for this location.

d.        Fourth, on September 8, 2020 I contacted the State Department, Diplomatic Security, Security Infrastructure Directorate, Office of Information Security, and spoke to the Industrial Security Chief ("SECURITY CHIEF-1").  SECURITY CHIEF-1 informed me that the State Department security offices are familiar with MONTAGE from previous security incidents at the 3636 16th Street NW, Suite AG-50 address, from several years ago, and knows the PREMSIES to be the corporate headquarters as represented to the State Department. SECURITY CHIEF-1 confirmed that as recently as September 8, 2020, the Department of Defense ("DoD") Defense Counterintelligence and Security Agency ("DCSA") confirmed an active Top Secret facility clearance for the PREMISES address, with a Secret level clearance for documents.[14]

[14] I note that the Facility Security Officer ("FSO") for the PREMISES was listed as Analisa LLESES, a MONTAGE employee for whom MONTAGE previously represented a fraudulent

e.        Fifth, FORMER EMPLOYEE-2 reported in sum and substance that the PREMISES are basically a front location that appear to be used primarily by MONTAGE to store documents.  FORMER EMPLOYEE-2 reported that LOCATION-1 is the location where the MONTAGE employees actually work on a daily basis.  FORMER EMPLOYEE-2 further stated that every morning while he was employed by MONTAGE, he and other MONTAGE employees would meet in the lobby of the PREMISES in Washington, D.C., and then take a bus to a covert MONTAGE business location at LOCATION-1 in Maryland.  LOCATION-1 is not reported by MONTAGE anywhere as its public office space.  Thus, similar to the PREMISES, LOCATION-1 also contains a misleading name on its entrance: "ASAM," or the American Society of Addictive Medicine.  A picture of LOCATION-1 is below:

---

work history and engineering experience.  For example, in 2016, LLESES's resume was submitted for the contractually-required key role of Construction Security Manager on the Madrid, Spain project, at which time MONTAGE claimed that LLESES had five years' experience with MONTAGE.  In actuality, at this time, LLESES had no construction experience at all, and had only worked for MONTAGE for approximately three months.



Thus, both of MONTAGE's corporate office spaces are publicly mislabeled.

   f.   Finally, even though the bulk of employees work at MONTAGE's "hidden" non-public Maryland office space at LOCATION-1, it is clear that the PREMISES are still used to conduct MONTAGE corporate business. The PREMISES are MONTAGE's corporate mailing address and the location from which MONTAGE employees are bused to their workspace at LOCATION-1. The PREMISES are where the State Department directs its correspondence for MONTAGE construction projects. And MOAYEDI is present at the PREMISES nearly every work day. For example, since on or about August 29, 2020, I have been following MOAYEDI's personal movements by tracking the estimated GPS position of his

cellphone provided by AT&T.[15]  These movements show that MOAYEDI generally follows a Monday through Friday work schedule, and over the last few weeks, typically departed from his residence and subsequently arrived at LOCATION-1, during the hours between 8:30 a.m. and 11 a.m. on Mondays through Fridays.  From LOCATION-1, MOAYEDI then frequently travelled to the PREMISES, where he spent several weekday hours.  For example, below is a representative snapshot of GPS tracking for MOAYEDI's cellphone locations on September 9, 2020.  Although there is some deviation, these movements are typical of the locations where I have observed MOAYEDI's cellphone over the past few weeks during business hours:

| | |
|---|---|
| 0927 hrs.: | MOAYEDI Residence (Chevy Chase, MD) |
| 0938 hrs.: | Montage, Maryland (LOCATION-1) |
| **1258 hrs.:** | **Montage, D.C. (PREMISES)** |
| **1446 hrs.:** | **Montage, D.C. (PREMISES)** |
| 1808 hrs.: | MOAYEDI Residence (Chevy Chase, MD) |

**Additional Evidence of MONTAGE's Use of Electronic Devices at the PREMISES**

55.    As noted, during the course of the investigation, I interviewed FORMER EMPLOYEE-3.  FORMER EMPLOYEE-3 stated that, in late 2015 or early 2016, State Department security personnel came to the PREMISES for a one-day meeting.  FORMER EMPLOYEE-3 stated that, when MONTAGE found out that State Department security personnel were coming for the meeting, MONTAGE management instructed employees to hide computers, papers, and documents in a closet.  Additionally, MONTAGE rented "clean"

---

[15] This information was obtained pursuant to a GPS cellphone warrant and order signed by United States Magistrate Judge Sarah L. Cave in the Southern District of New York on or about August 28, 2020.

computers to stand in for their regular computers, so it would appear that MONTAGE was following standard security protocols.

56.     In addition, FORMER EMPLOYEE-2 stated that, during his approximate one-month assignment in Washington, D.C. in May or June of 2017, he learned that the PREMISES was primarily used to store documents.  However, FORMER EMPLOYEE-2 also stated that Montage Chief Financial officer (CFO) Nader Golpayegani's work location was at the PREMISES, where classified information was also stored.  I reviewed emails that were sent to OBO from Nader Golpayegani's email address (Golpa@montageinc.com) as early as October 2014.  In the emails, Golpayegani was sending certifications of payment on behalf of Montage projects in Guayaquil, Prague, and Madrid through at least 2018.  Some of these emails are from May 2017, the approximate timeframe during which FORMER EMPLOYEE-2 identified Golpayegani as working at the PREMISES.

57.     On or about September 28, 2018, personnel with the U.S. Department of Homeland Security—Homeland Security Investigations (HSI) conducted a border search of FORMER EMPLOYEE-5 (the Guayaquil Project Director) after he landed from Guayaquil at Miami International Airport in Miami, Florida.  Paper documents in FORMER EMPLOYEE-5's possession included multiple logs entitled "Montage Electronic Devices Onsite Guayaquil MSGR 2015-2018".  As detailed in the photograph below, in these logs, dozens of pieces of electronic equipment, which had once been on site at the GUAYAQUIL PROJECT, were cataloged by type, make, and serial number.  For example, at least approximately 18 laptops, 4 tablets, and numerous printers were included.  Additional columns indicated the "date wiped" for certain GUAYAQUIL PROJECT devices, or the "date removed," for certain devices.  Moreover,

numerous notations as to the current storage status/location of some of these electronic devices
included entries indicating that the devices had been relocated to "Montage HQ," which I believe
denotes the PREMISES:

| Montage Electronic Devices Onsite - Guayaquil MSGR 2015-2018 | | | | |
|---|---|---|---|---|
| Type of Device | Make/Model | Serial No. | Date Wiped | Date Destroyed/ Removed |
| Blank CDs | N/A | N/A | All Used | |
| BRADY LABEL | BMP 21 PLUS | PGM 211613809260 | Montage HQ | |
| Computer | Samsun Note 3 | SMN900A | Montage HQ | Sep 2017 |
| CPU | Lenovo/TS140 | 11S0B94352ZVJ8864C | | September 25 |
| External Back Up | CGATE | Q12053108C5 | Montage MHQ | May 2017 |
| External Back up | My Passport Ultra | WX41AB4AFJHA | " | |
| External Back Up | Radioshack | NT2500 | " | |
| External Back Up | SeaGate | 2GE1WBMS | " | |
| External CD | HP | 427430502654 | All Used | |
| Flash Drive | Imation / Swivel 16 GB | 5112227125 | MHQ | |
| Fusion Slicer | ARC | 03034 | Montage HQ | |
| HARD DRIVE | TOSHIBA/ MQ01ABF050 | S/N | | |
| LAPTOP | ASUS/GL551JW | F7NOCJ07114131A | June 19 | September 25 |
| LAPTOP | ASUS/GL552V | FBN0CV4161/9461 | June 15 | |
| LAPTOP | Dell | E6510 (CFL6YN1) | Montage HQ | |
| LAPTOP | Dell | E6510(1HRSTM19) | Montage HQ | |
| LAPTOP | Dell | E6510(BRB34Q1) | Montage HQ | |
| LAPTOP | Dell | 16871231666 | Montage HQ | |
| LAPTOP | DELL - LATITUDE E6440 | 9530N32-1989844067D | | |
| LAPTOP | DELL /INSPIRON | P20G001 | Air conditioner Configuration | |
| LAPTOP | Dell Inspiron 14 | BMVT432 | | |
| LAPTOP | DELL/ INSPIRON 15-55 | 274893019 | Allan's Computer | |
| LAPTOP | DELL-PP18L | 6210 | | |
| LAPTOP | HP Pavilion | 003726000000000AA171 | Air Conditioner configuration | |
| LAPTOP | HP/15-1010WM | 5CD4357JMB | | |
| LAPTOP | LENOVO / 20138 | CB22566901 | | |
| LAPTOP | Lenovo/G550-70 | YR06624779 | Montage HQ (thad) | |
| LAPTOP | Samsung SM T350 | R52J50GSE6D | | |
| LAPTOP | Sony Vaio | PCG7132P | | |
| LAPTOP | Toshiba Satellite | 3F0583595 | Montage HQ | |

Dell Latitude E5470

1 of 2

58.     In sum, based on my interviews with former employees, surveillance conducted by agents working on this investigation, my review of subpoenaed documents, my review of publicly available documents and web-based information, and GPS tracking of MOAYEDI's cellphone, I submit that there is probable cause that the PREMISES contain electronic devices used in furtherance of the SUBJECT OFFENSES.  First, there is probable cause that MOAYEDI conducts MONTAGE business at the PREMISES, given (1) MOAYEDI's regular, multi-hour presence there, including consistently this month; and (2) MOAYEDI's frequent use of electronic devices in furtherance of the Subject Offenses, such as his submittal of false documents using a computer (as noted above) and his use of Dropbox (also noted above). Second, as noted throughout this Affidavit, the crimes under investigation have involved the repeated use of computers, email, and cellphones—*e.g.*, through fraudulent submittals, electronic submission of payment applications, doctored electronic documents, a forged business license, unauthorized use of an electronic signature, modification of architectural drawings, and the unauthorized use of Dropbox.  Third, based on the foregoing, I submit that there is probable cause that MONTAGE (1) conducts business at the PREMISES, even though it is not the primary day-to-day workspace of most employees; (2) has a work station at the PREMISES, as supported both by Montage CFO Golpayegani's working there regularly in spring 2017, and by MOAYEDI's regular presence at the PREMISES; and (3) keeps electronic equipment at the PREMISES (such as equipment associated with the Guayaquil Project), whether for purposes of storage, for purposes of deceiving the State Department (as in late 2015 or early 2016), or both. Fourth, because the PREMISES are MONTAGE's only address of record with the State Department (for at least the past decade), it is reasonable to infer that MONTAGE has electronic

equipment at the PREMISES that would permit MONTAGE to review sensitive or classified information—or at least to give the appearance that this is the location at which MONTAGE views such materials.  This is supported by FORMER EMPLOYEE-2's statement that classified information was stored at the PREMISES.  Lastly, as Montage has been in business since 1986, it is reasonable to believe that just as it archives documents at the PREMISES, it likely archives computers, discs, and other electronic equipment there.

59.    If the proposed warrant is granted, among the items that will be the subject of the search will be evidence of forged as-built drawings and plans relating to the GUAYAQUIL PROJECT and other projects, evidence of possible use of Dropbox for classified or sensitive documents, evidence of actual ownership of MONTAGE, evidence regarding employee qualifications and forged resumes, and evidence of identity theft of non-MONTAGE employees, including VICTIM-1.  Among the places that I expect to find such information at the PREMISES include in computers or electronic devices, in MONTAGE's books and records, in MONTAGE's electronic files and email communications, and in MONTAGE's hard copy, paper files, and construction documents and plans.

## TECHNICAL TERMS

Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.    "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

35

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.  These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

      d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer

software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the

connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.   Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely

identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.    "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.    When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

40

ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

o.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network- hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

60.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B).  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully

submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

        a.      In my experience, individuals who engage in criminal activity, particularly when fraud is involved, often do so by using computers or other electronic devices, by among other things, using digital devices to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; to retain contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; to transmit stolen financial and personal identification data, including names, addresses, telephone numbers, social security numbers  and resumes of other individuals; and to keep records of these transactions.  Thus, for example, much of the evidence discussed in connection with the SUBJECT OFFENSES herein is electronic in nature (*e.g., see supra* ¶¶ ---, forged construction plans were submitted to State Department electronically; *supra* ¶¶ ---, sensitive and potentially classified construction information was transferred electronically through unauthorized cloud computing system; *id.* ¶¶ ---, forged final drawings submitted to State Department electronically; *id.* ¶¶ ---, identity theft by misappropriating the resume of a third party may have involved electronically editing the resume).

        b.      Moreover, individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old

digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.       Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

61.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.   Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.   Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.   Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive,

memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team

46

and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f. I also know that when an individual uses a digital device to commit a crime, such as the uploading of forged submittal documentation, or the transfer of sensitive or classified information via Dropbox, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

62.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-

49

text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

       e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in

criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

> f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

63.      The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

> a.      Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

>> 1.      Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed

capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to

be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## CONCLUSION

64.     I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,



_____
Christopher D. Swenson
Special Agent
United States Department of State –
    Office of Inspector General

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)
(3) on this 18th day of September, 2020.

2020.09.18 18:39:35
-04'00'
_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

54